16304.   RUFFNER *v.* SOPHIE MAE CANDY CORPORATION.

16343.   SOPHIE MAE CANDY CORPORATION *v.* RUFFNER. ·

STEPHENS, J. 1. "A corporation does not reduce its capital stock . . by purchasing shares thereof, where it does not retire them, but sells and transfers them to others or holds them ready for such sale and transfer." 14 C. J. 492.

2. Where a corporation, before executing a contract by which it purchases 516 shares of its own capital stock for a consideration of $40,000 (of which sum it pays in cash $20,000, and for the balance of which it executes notes), has received from a prospective purchaser of its capital stock $25,000, which he has deposited with it for the purpose of being applied upon the purchase of 500 shares of the stock, for which he agrees to pay $35,000, and where the stock purchased by the corporation is purchased not for the purpose of being extinguished or retired, but for the purpose of being reissued or resold, and where the corporation, after purchasing the 516 shares, provides for an increase of its capital stock from $100,000 to $150,000, accepts the offer of the prospective purchaser for 500 shares, retains the money deposited, and issues the stock, and where at the time the outstanding capital stock of the corporation amounts to $77,350, the transaction does not amount to a reduction by the corporation of its capital stock below the minimum of $60,000 provided in its charter.

3. A corporation which is not insolvent may in good faith and to serve its best interests accept the resignation of one of its officers as its president, and, in consideration of his resignation, purchase from him his shares of the capital stock of the corporation at an agreed valuation,

---

Bills and Notes, 8 C. J. p. 1060, n. 40.

Corporations, 14 C. J. p. 492, n. 27; p. 870, n. 29; p. 871, n. 50; 14a C. J. p. 131, n. 95 New; p. 153, n. 53; p. 275, n. 58; p. 276, n. 59; p. 281, n. 1.

Trial, 38 Cyc. p. 1575, n. 31.

where the stock is not retired but is held for resale or reissue. Joseph *v.* Raff, 82 App. Div. 47 (81 N. Y. Supp. 546); Gilchrist *v.* Highfield, 140 Wis. 476 (123 N. W. 102, 17 Ann. Cas. 1257); In re Castle Braid Co., 145 Fed. 224 (3); Copper Belle Mining Co. *v.* Costello, 11 Ariz. 334 (95 Pac. 94).

4. A stockholder owning a majority of shares of the capital stock of a corporation may, at a stockholders' meeting regularly held, bind the corporation to contract with him for the purchase of his property, provided the contract is made for a fair consideration representing the true value of the property, is not detrimental to the interests of the minority stockholders, and is not the result of fraud. 7 R. C. L. 309; Wheeler *v.* Abilene National Bank Bldg., 159 Fed. 391 (89 C. C. A. 447, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917); Gamble *v.* Queens County Water Co., 123 N. Y. 91 (25 N. E. 201, 9 L. R. A. 527).

5. It does not appear as a matter of law that the plaintiff obtained the contract by fraud.

6. There being evidence to authorize the inference that the notes sued on, which were given by the corporation for the purchase price of its own capital stock, were, under the above rulings, valid and binding obligations against the corporation, the court erred in directing a verdict for the defendant corporation in the suit upon the notes, and also in directing a verdict for the plaintiff upon the corporation's counterclaim against him.

7. See *McGregor* v. *Fitzpatrick,* 133 *Ga.* 332 (65 S. E. 859, 25 L. R. A. (N. S.) 50, note); *Dalton Grocery Co.* v. *Blanton,* 8 *Ga. App.* 809 (70 S. E. 183).

*Judgments in both cases reversed. Jenkins, P. J., and Bell, J., concur.*

DECIDED FEBRUARY 26, 1926.

Complaint; from Fulton superior court—Judge Ellis. February 6, 1925.

STATEMENT OF FACTS BY STEPHENS, J.

Shirley Ruffner sued Sophie Mae Candy Corporation upon two promissory notes dated May 8, 1922, aggregating $13,000, payable to the plaintiff and executed by "Sophie Mae Candy Corporation (L. S.) by William Dunlop, its Treasurer." The defendant corporation admitted the execution of the notes, but alleged that they were given for a balance due upon the purchase by it of 516 shares of its own capital stock, and that by reason of such purchase its capital stock was reduced below the minimum of $60,000 allowed by its charter, and that the execution of the notes had been procured by fraud, the alleged fraud being that the purchase of the stock and the execution of the notes were authorized by a meeting of the stockholders of the corporation at which the plaintiff, who was at the time the president and a director of the corporation and who owned a majority of the stock, was present and voted, and that

the plaintiff concealed from the stockholders the fact that he was indebted to the corporation, and also concealed from them the fact that the corporation owed various outstanding debts. The corporation also filed a counterclaim against the plaintiff, alleging that he was indebted to it in various sums alleged.

On the trial the notes sued on were introduced in evidence. From the evidence it appears that at the time of the execution of the notes Ruffner, who was president and a director of the corporation, was the owner of 516 shares of its capital stock; that the corporation had agreed with Ruffner to purchase this stock for a consideration of $40,000; that it paid $20,000 to Ruffner upon the purchase price, and on May 8, 1922, executed the notes sued on and another note for the balance; that some time in 1922, before the execution of the contract for the purchase by the corporation of Ruffner's stock, William Dunlop contemplated investing some money in the corporation and entered into negotiations with Ruffner for that purpose; that after considerable correspondence between them and an investigation by Dunlop of the affairs of the corporation, Dunlop made two deposits with the corporation, aggregating $25,000; that, in the language of Dunlop, the first deposit, which was $2,500, was made with the corporation "with the idea that I would later become a stockholder in the company." It appears from the defendant's plea that Dunlop at the time agreed to purchase from the corporation 500 shares of its stock for $35,-000. Dunlop testified: "I contemplated making a bigger investment than that, and have since; I put in my $22,500, together with the $2,500 that I had already deposited with them, before I made any further investigation; it was the purpose of making that investment in the company if my investigation satisfied me." It appears from the evidence, that, after a further investigation of the affairs of the corporation during the negotiations with Ruffner, Dunlop became dissatisfied and suggested to Ruffner a return of the money which Dunlop had paid in to the corporation; and, after further negotiation between them, Ruffner proposed to Dunlop that he (Ruffner) would, in the language of Dunlop, "sell out to the corporation, so I could take the stock in the corporation in his place; . . he was to sell his stock and I was to take it. I was to take his place in the company." Dunlop testified: "Mr. Ruffner and I reached a tentative agreement, signed by him and

by me as treasurer of the Sophie Mae Candy Company. I was not treasurer, however. Mr. Ruffner dictated that suggestion that I sign as treasurer. I signed as treasurer on the 8th of April. That paper contains the results of my tentative negotiations up to that time. My proposition was, I wanted to get out, and his counter-proposition was, he would get out, and he did. I bought his stock from the company. . . I continued my investigation and I kept it up until some time in May. The tentative agreement was dated April 8. There was a final agreement substantially to the same effect which was consummated on the 8th day of May." It appears that on that date the contract by which the corporation purchased Ruffner's stock was executed by Dunlop acting for the corporation, Dunlop in the meantime having been elected president and treasurer of the corporation, and Ruffner having resigned and severed his connection with the corporation. On that date Ruffner was paid $20,000 on the purchase price of his stock, and his stock, consisting of 516 shares, was transferred to the corporation. Dunlop further testified: "I closed up that trade on May 8. I bought him out 'lock, stock and barrel;' . .. I did not buy his check [stock?]; he sold his stock to the company and I got the stock in the company later on; it was not part of the same deal; there was no connection whatever. The company bought all of Mr. Ruffner's stock and bought out all his interests in the business; he got out and has not had anything to do with the business since. . . The transaction was closed up on May 8; on the 11th day of May I got 550 shares, as I remember it." It appears that before Dunlop became connected with the corporation, and when the stockholders voted an acceptance of Ruffner's proposition to sell to it his capital stock, the stockholders adopted a resolution authorizing an increase of the stock from $100,000 to $150,000. It appears from the minutes of the corporation that on May 11, after the contract with Ruffner had been executed, 500 shares of the capital stock were issued to Dunlop and 150 shares were issued to J. B. Coppedge.

The minute books of the corporation were introduced in evidence and showed in part the following: that a notice was signed by Shirley Ruffner, the president, and J. B. Coppedge, the secretary, who together owned more than one third of the outstanding stock of the corporation, calling a special meeting of the stock-

holders for the purpose of considering the election of new directors of the corporation, to consider the purchase from Shirley Ruffner of 516 shares of stock in the corporation, to increase the capital stock from $100,000 to $150,000, to amend the by-laws so that the officers should be president, treasurer, vice-president, and secretary, and so that the offices of president and treasurer might be combined in one person. The notice stated also that the meeting was called to transact other matters mentioned and any other or further business in connection with the several matters set out as might be necessary. It further appeared from the minutes introduced in evidence that the meeting was called for May 5, 1922, and that on that date there were present, either in person or by proxy, stockholders representing 693 shares of the corporate stock, 516 of which were owned by Shirley Ruffner, who was represented by proxy, J. B. Coppedge, and that the shares represented more than a majority of all the outstanding stock of the corporation and constituted a quorum according to the by-laws. A resolution was unanimously adopted accepting the resignation of all the directors, including Shirley Ruffner, and electing as directors William Dunlop, J. B. Coppedge, and another. A resolution was unanimously adopted authorizing the purchase from Shirley Ruffner of 516 shares of the capital stock of the corporation upon the terms and conditions set out in a contract submitted for the approval of the stockholders, and authorizing the president of the corporation to execute this contract in behalf of the company and "to do all other things necessary or incidental to the consummation of said trade." A resolution was unanimously adopted increasing the capital stock of the corporation from $100,-000 to $150,000. A resolution was also unanimously adopted providing that the offices of president and treasurer be combined in one person, and that the offices of vice-president and secretary be combined in one person.

The minutes of the directors' meeting, held immediately after the meeting of the stockholders, were also introduced in evidence. It appears that all three of the directors were present. William Dunlop was elected chairman and J. B. Coppedge was elected secretary of the board of directors. The resignation of Shirley Ruffner as president was accepted, William Dunlop was elected president

and treasurer of the corporation, and J. B. Coppedge was elected vice-president and secretary.

On May 8, 1922, the notes sued on were executed and Shirley Ruffner transferred 516 shares of stock to the corporation. Also on that date the contract agreed upon by the stockholders was executed by the Sophie Mae Candy Corporation, by William Dunlop, its president, of the one part, and by Shirley Ruffner of the other part. It is conceded in the brief of counsel for the defendant corporation that at the time of the execution of this contract the outstanding stock of the corporation amounted to $77,350. This contract provided for the sale by Shirley Ruffner to the Sophie Mae Candy Corporation of 516 shares of the stock of that corporation for $40,000, $20,000 of which it recited was paid in cash, the balance of the purchase-money to be payable in three promissory notes. Shirley Ruffner warranted that all the liabilities of the corporation of every kind whatsoever would not exceed $2,000, and he expressly assumed personal responsibility for any liabilities of the corporation in excess of this amount existing April 8, 1922. It was agreed that if it should be ascertained that the liabilities of the corporation upon that date exceeded $2,000, the corporation could offset the excess against the notes, but that this should not be the corporation's exclusive remedy. It appears that the corporation paid dividends to its stockholders in May, 1923, and in February, 1924.

The charter of the corporation, which was introduced in evidence, provided for a minimum capitalization of $60,000, with the privilege of increasing the capital stock to $500,000 at the par value of $100 per share.

There is some evidence tending to establish a counter-indebtedness from Ruffner to the corporation.

A verdict was directed for the Sophie Mae Candy Corporation in the suit upon the notes. A verdict was directed for Ruffner upon the counterclaim alleging an indebtedness by him to the corporation.

*Neufville & Neufville, Colquitt & Conyers,* for Ruffner.

*Horace Russell, Watkins & Asbill,* for Sophie Mae Candy Corporation.