## TODD et al. v. MARYLAND CASUALTY CO. et al.
### No. 8879.

Circuit Court of Appeals, Seventh Circuit.
April 26, 1946.

Gottlieb & Schwartz, Marvin J. Welfeld, and Claude A. Roth, all of Chicago, Ill. (H. N. Gottlieb, Jack H. Oppenheim, and Maurice Rosenfield, all of Chicago, Ill., and James Morfit Mullen, of Baltimore, Md., of counsel), for appellants.

Carl Meyer, Leo F. Tierney, and Donald M. Graham, all of Chicago, Ill. and Frederick W. Brune, of Baltimore, Md. (Mayer, Meyer, Austrian & Platt, of Chicago, Ill., and Semmes, Bowen & Semmes, of Baltimore, Md., of counsel), for Reconstruction Finance Corporation.

J. F. Dammann and James W. Close, both of Chicago, Ill., Harry N. Baetjer and Austin J. Lilly, both of Baltimore, Md. (Wilson & McIlvaine, of Chicago, Ill., and Venable, Baetjer & Howard, of Baltimore, Md., of counsel), for Maryland Casualty Co.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a decree entered January 26, 1945, dismissing for want of equity a suit to set aside as illegal, inequitable, and in breach of fiduciary relationship certain transactions (called "1942 plan") consummated September 9, 1942, between the Reconstruction Finance Corporation (called "RFC") and Maryland Casualty Company, a corporation (called "Maryland"), and its wholly owned subsidiaries, involving an increase of $12,500,000 in Maryland's indebtedness to RFC. The decree appealed from was predicated upon extensive findings of fact made by the lower court and its conclusions of law applicable thereto. The action was instituted as a class suit under Rule 23 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, by certain holders of the Common shares of Maryland on their own behalf and on behalf of all the holders of such shares as a class.

At the time the 1942 plan of refinancing was consummated, Maryland was indebted to the RFC because of loans theretofore advanced in the sum of $17,500,000, which indebtedness by the 1942 plan was increased $12,500,000, making a total indebtedness to RFC of $30,000,000. By reason of a certain provision contained in Maryland's charter, a legal consummation of the refinancing plan required its approval by two-thirds of the votes of each class of stockholders. For the purpose of readily obtaining the requisite approval of the Common stockholders, RFC shortly prior to the consummation of the 1942 plan caused 29,487 shares of Class A Preferred Stock held by it as security for loans theretofore advanced converted into 1,474,350 shares of Common Stock at the ratio of 50 to 1. These shares of Common Stock thus acquired by RFC were voted in favor of consummation of the plan, and in the absence of RFC's vote so represented the plan did not have the necessary approval of the Common stockholders.

The contested issues arise from plaintiffs' contention that a conversion by RFC of Preferred Stock held by it into Common Stock was without authority and therefore illegal and void. Consequently, the 1942 plan was in violation of Maryland's charter because it did not have the required approval of two-thirds of the Common shares. In this connection, it is also asserted that RFC was without statutory power to hold Common Stock of an insurance company as security for a loan for capital purposes. A further contention is that the RFC occupied a fiduciary relation to the Common stockholders and could not bind them to a plan of financing which it is asserted was

unfair to them. Further, it is contended that the 1942 plan was unnecessary and that it was unfair, inequitable and illegal in numerous other respects.

A large amount of testimony was heard and much was said in this court concerning the relationship existing between RFC and Maryland prior to the adoption of the 1942 plan. Inasmuch as plaintiffs' attack is directed solely at the 1942 plan, conceding the legality of all past transactions, it becomes unnecessary to enter into a detailed discussion of such transactions; in fact, they are material to the issues raised in this law suit only insofar as they throw light or bear upon what transpired in connection with the 1942 plan.

Maryland is an insurance corporation organized under the laws of the State of Maryland in 1898, and at the time relevant to this case had developed into one of the largest casualty and surety companies of the country. Its activities included the guaranty of mortgages on real estate. In the early 1930's it became seriously involved financially; in fact, it faced financial disaster. Included in its liabilities were $54,000,000 in real estate mortgages guaranteed by it. In common with many other insurance companies and financial institutions in general, it was no longer able to borrow money in the usual manner; in fact, its credit had been entirely exhausted. Like other concerns of its kind, it turned to the newly created RFC for financial assistance. An impressive showing was made to that agency of the need for such assistance and of the dire consequences not only to the insurance and casualty field but to the country in general which would otherwise ensue.

On October 17, 1933, the RFC agreed to make available to the Maryland capital funds $7,500,000, upon certain specified conditions, among which were that Maryland obtain subscriptions of at least $500,000 to stock subordinate to that issued to RFC as security for its loan, that twenty persons (officials of Maryland) guarantee the loan to the extent of $2,000,000, that some nineteen insurance companies jointly and severally guarantee the loan to the extent of $1,000,000. These requirements were made by RFC in order to comply with the law by which it was created. The proposal was approved by Maryland stockholders, and it was agreed between Maryland and RFC, for reasons not here material, that the loan should be made to Eastern Mortgage and Securities Company (called "Eastern"), a wholly owned subsidiary of Maryland. The loan thus obtained by Eastern was turned over to Maryland in exchange for 1,000,000 shares of newly created First Convertible Preferred Stock of Maryland, the certificates for which were issued in the name of and delivered to RFC to be held in pledge by it as security for the debt of the subsidiary. Eastern also delivered to RFC its note secured by the guarantees above referred to.

Shortly after this first loan was made, it became apparent to all concerned that the amount loaned by RFC was grossly insufficient. Therefore, on August 17, 1934, RFC agreed to advance for capital purposes an additional $10,000,000 on substantially the same basis as the first advance of $7,500,000. Another subsidiary of Maryland, Maryland Holding Company (called "Holding") was formed to effect this loan. Another series of First Convertible Preferred Stock was issued, designated as Series A, which like the previous stock was issued in the name of RFC. This loan, as the first loan, was properly approved by Maryland. It also is pertinent to note that each of the loans was approved by the Secretary of the Treasury and by the President of the United States, as required by law.

In 1937, for reasons which we think unnecessary to relate, the two Preferred Stock issues were reclassified into one issue consisting of 174,487 shares designated as Class A Preferred Stock, each share of which had a par value of $10.00, a principal asset preference and a principal redemption price of $100.00, bore a $3.50 cumulative annual dividend, and recited that the holder was entitled to 100 votes per share. Under the reclassification agreements, 75,000 shares of this stock were allocated as security for the Eastern loan, and the remaining 99,487 shares as security for the Holding Company loan. This stock also carried conversion rights and permitted such stock to be retired with the consent of two-thirds of the holders

of the Preferred Stock. The 1937 reclassification of stock was approved by the necessary vote of each class of stock, including the Common.

At this point it may be noted that RFC, in connection with the loans made by it to Maryland, obtained and exercised a large measure of control over the management and affairs of the latter. This was achieved by reason of the voting rights acquired by RFC in connection with the stock held by it. A person designated by RFC became president and another designated by it became general counsel of Maryland. Other changes were made at the suggestion of RFC in the executive officers as well as the board of directors, although it appears that in the main such officers and directors were the same as those who served prior to the time of the loans made by RFC.

During the period from 1934 to 1942, Maryland unquestionably made remarkable progress in placing its financial structure in order; in fact, the progress thus made in itself constitutes a tribute to its management as well as to the wisdom of the officials of RFC in going to its rescue. Neither plaintiffs nor any other stockholder from 1934 to 1942 objected to or questioned the propriety of the protection which RFC exacted as a condition to the making of the loans.

Notwithstanding the progress made during this period, Maryland was continually in difficulty because of the inadequacy of its capital structure, which was a matter of serious concern both to Maryland and to RFC. As a result, numerous negotiations were carried on between Maryland and RFC relative to a further advance by the latter so as to put Maryland in a better competitive position and increase its earnings for the mutual benefit of Maryland and RFC. The latter ordered an investigation by one of its examiners, who in March, 1942 filed a voluminous written report reviewing the entire financial structure of Maryland, the progress it had made, and the deficiency in its capital structure, with a recommendation that a further loan of $12,500,000 be made.

As a result of this report, as well as many other factors unnecessary to relate, RFC tentatively agreed to make the additional loan. It was proposed by RFC that Maryland authorize and issue 299,487 shares of Preferred Stock to and in the name of RFC in exchange for a loan to Maryland of $12,500,000, and the surrender by RFC for cancellation and retirement the outstanding 174,487 shares of Class A Preferred Stock then held by it as security for previous loans. The new stock issue proposed by RFC was to carry a lower dividend rate corresponding with the reduced interest rate on the RFC loans (old as well as new). The proposal also provided for the declaration and payment of all unpaid dividends accumulated upon the stock then held by it in an amount of more than $3,000,000. (No dividends had been paid on the stock held by RFC between 1937 and 1942.) A number of officials of Maryland who negotiated this 1942 transaction testified that they agreed to the RFC proposal because in their judgment it was fair. The proposal was approved by Maryland's executive committee and by its directors by a vote of 19 to 1 of those present. Of the 14 members not present, 13 wrote letters of approval. Thereupon, the plan was recommended to Maryland's stockholders and due notice sent to them of a meeting to take place on September 9, 1942, at which it was proposed to act upon the plan.

As negotiations between Maryland and RFC neared a conclusion in August, 1942, officers of the former pointed out to the latter the difficulty of securing the attendance of a sufficiently large number of holders of Common Stock to assure a two-thirds vote of all the outstanding Common Stock at a meeting of the stockholders to consider and act upon a proposed amendment to the charter essential to the making of the additional loan. Inquiry was thereupon made of RFC if it would be willing to effect a conversion of a part of the Class A Preferred Stock held by it into Common Stock so as to eliminate the possibility that the proposed amendment would fail due to non-attendance of Common stockholders. On August 20, 1942, RFC decided to effect a conversion of 29,487 shares of Class A Preferred Stock held by it. The conversion was carried into effect on August 21, 1942, thereby substituting 1,474,350

shares of Common Stock as collateral for the loans, leaving as collateral a balance of 145,000 shares of Class A Preferred Stock.

As a result of the conversion of the 29,487 shares of Class A Preferred Stock into Common Stock, the RFC waived accrued dividends on the Preferred Stock so converted amounting to approximately $535,000, and also its Preferred position upon the Preferred Stock thus converted.

A stockholders' meeting was held on September 9, 1942. Among those who attended was plaintiff Williams, who had with him proxies representing 41,000 shares of Common Stock. The charter amendments necessary to effectuate the plan were submitted to a vote of the shareholders. The vote of all the stock, Preferred and Common, held by RFC was in favor of the plan. This included, of course, 1,474,350 shares of Common held by it as a result of the conversion heretofore referred to. Of the 799,923 shares of Common Stock publicly held, 443,567 shares voted in favor of the plan and 47,839 shares voted against it. Thus the two-thirds vote of Common shareholders required for approval of the plan was obtained only by including those held by the RFC or at any rate a portion of such shares.

Thus we come to what we think is the most important and well near controlling issue raised on this appeal, that is, whether RFC had the authority to convert as it did a portion of its Preferred to Common Stock. If so, the 1942 plan was properly approved by two-thirds of the Common stockholders. On the other hand, if RFC was without such authority the conversion was illegal and the approval of the plan was without the required two-thirds of the Common shareholders. In the latter event it appears, in fact no contention is made to the contrary, that the loan of $12,500,000 was illegally made and must be declared null and void and of no effect.

On this issue the trial court found: "The right of conversion of Class A Preferred Stock into Common Stock of the Maryland was a right which was one of the characteristics of the Preferred Stock itself and by express charter provision could be exercised by the holder of the stock. The Preferred Stock was issued in the name of R.F.C. and the charter provision for the conversion and voting power of the Preferred Stock was an element of the contract for the loans. The parties intended that the conversion right should be exercised whenever R.F.C. saw fit to do so."

If this finding rests upon proper support, it is at once apparent that plaintiffs' contention must be denied. Plaintiffs at one point in their brief assert: "In the letter of August 20, 1942, requestng such conversion to be made, R.F.C. * * * did so simply on the basis of R.F.C.'s being the 'holder of record' of the shares in question. * * * R.F.C. treated the transaction as if it were the actual owner of the shares wholly ignoring the fact that it was merely the pledgee thereof * * *."

At another point: "It [R.F.C.] simply asserted the privilege of conversion provided in the charter for the actual owner of the shares."

This leads at once to the charter provision upon which the RFC relies and which plaintiffs contend is without application. It provides, so far as here material: "Any holder of * * * Class A Preferred Stock * * *, at the option and upon the written request of such holder at any time, up to but not including the tenth day before the date set for the retirement of such shares, may exchange shares of such stock for Common Stock, of One Dollar ($1.00) par value per share, upon the following basis: * * * Fifty (50) shares of Common Stock for each share of Class A Preferred Stock * * *. Certificates for the converted stock so exchanged shall be surrendered to the Company in transferable form and shall be cancelled when the authorized amount of such class of stock converted shall be reduced accordingly. Certificates for Common Stock shall be delivered in lieu of those for the stock so exchanged and cancelled." (Paragraph P, Sec. 6 of the Articles of Amendment and Reduction of January 26, 1937.)

Plaintiffs construe the words "any holder of" to mean any owner and argue that as the owner of Class A Preferred Stock RFC was not authorized to convert the same. No authorities are cited in sup-

port of plaintiffs' premise that the word "holder" should be construed to mean "owner," and we think it is palpably unsound. True, the Preferred Stock was issued to and in the name of RFC. It is equally true, however, that RFC did not hold the stock as actual owner but solely as security for a debt owing it by Maryland. We assume that there is no question but that Maryland is entitled to a return of the stock upon the payment of its obligation to RFC. Furthermore, we think it is rather immaterial and certainly not controlling as to the precise legal status accorded to RFC in its relation to this stock. Whether it was the owner or a mere pledgee, it certainly was the "holder" thereof within the express language of the charter amendment authorizing a conversion.

Plaintiffs, after ignoring the fact that "any holder" was authorized to convert, proceed upon the theory that if RFC was not the owner it was in any event a mere pledgee without the right to convert. Predicated upon this premise, certain principles of law are sought to be applied, among which are that a pledgee does not have the rights of an owner, that the primary duty of a pledgee is to preserve the status of the pledge property unimpaired for restoration thereof to the pledgor upon discharge of the debt, and that a pledgee is without right to use or deal with the thing pledged for his own purposes. Numerous authorities are cited in support of such contentions. We think we need not consider such authorities for the reason that assuming they state correct propositions of law, they are without application to the instant situation. This is so for the reason, as already shown, that RFC as a "holder" of the Preferred Stock was expressly authorized by Maryland to convert the same.

Moreover, the certificates of Common Stock issued to the plaintiffs provided on the face thereof: "A statement of the designations, priorities, preferences, rights, privileges and voting powers and the restrictions and qualifications thereof, and of the terms of conversion and retirement of the several classes of stock of the Company, as set forth in the Certificate of Amendment of Charter of the Company, is printed on the back hereof, and this Certificate and the shares represented hereby are issued and shall be held subject to all of the provisions of said Certificate of Amendment, to all of which the holder, by the acceptance hereof, expressly assents and is bound."

The "terms of conversion and retirement" contained in the charter amendment thus appeared upon the back of such certificates and authorized "any holder" of Class A Preferred Stock to convert the same into Common Stock. Thus a Common stockholder was given actual notice not only of the right of RFC to convert but of the terms upon which such conversion could be made. It further appears from the language on the face of the certificate that each Common stockholder by the acceptance of such certificate expressly assented and agreed to be bound.

Plaintiffs further insist that the conversion by RFC was contrary to the intention of the parties. We think this is another contention beside the point in view of the fact, as we have shown, that RFC was expressly authorized to make such conversion and that the authority so given was in conformity with Maryland's charter. If, however, the intention of the parties be material we are of the view that the record discloses no intention inconsistent or contrary to the express authority to which we have referred. It is hardly conceivable that the RFC would have been willing and certainly it would not have been justified in pouring such a vast amount of government funds into an enterprise so near the brink of disaster without the employment of every available protection. Anything less on its part would have constituted a dereliction of its responsibility. It was in a position to dictate the terms and conditions upon which it was willing to loan, and it would seem that the authority to convert was essential in order that RFC might not at some time find itself at the mercy of the Common stockholders. As the lower court found: "The voting power given to the Preferred Stock placed RFC in control of Maryland's ordinary business, while the conversion right enabled RFC to control any matters which

required approval of both classes of stockholders."

Plaintiffs further argue no authority authorizing RFC to convert is to be found in the collateral notes executed by Eastern and the Holding Company (subsidiaries of Maryland). Defendants rely upon the following provision contained in such notes as authority for conversion: "Whenever any item of collateral shall not be paid when due, or otherwise shall be in default, whether or not this note has become due, the Payee shall have the same rights and powers in respect of such item of collateral as are granted in respect thereof in this paragraph in case of nonpayment of this note when due."

Plaintiffs argue there was no default on the notes, notwithstanding the fact that no dividends had been paid RFC for several years on the stock held by it as collateral, to which, as we understand, RFC was entitled in lieu of interest on the notes. Plaintiffs appear to concede that on its face this failure to pay dividends would constitute a default on the notes but assert that it should not be so declared because funds available for such purpose were used by Maryland under the direction of RFC for other purposes. To declare a default under such circumstances, so it is stated, would permit RFC "to take advantage of its own unlawful action." We are unaware of what "unlawful action" is referred to. There is no contention that any of Maryland's funds were misappropriated or used for any purpose other than those essential to Maryland's financial rehabilitation.

In our view, the notes were in default as to interest and RFC had the same rights and powers "as are granted * * * in case of non-payment of this note when due." In the latter contingency the payee was authorized to "exchange or substitute any item of collateral" with the maker or any third party without notice to the maker or an assignee. Assuming, however, as plaintiffs contend, that the notes contain no conversion authority, we are of the view that it is immaterial and certainly not controlling. The point is, so we think, there is no provision in the notes which inhibits a conversion by RFC. Ae we have previously shown, the authority to do so

was contained in Maryland's charter, it was part of the agreement incident to the acquirement of the Preferred Stock by RFC, all of which plaintiffs had knowledge of by reason of the provisions contained in the certificates of stock issued to them. Under such circumstances, we think it was unnecessary that the authority be expressly contained in the notes executed as evidence of the indebtedness.

Another issue raised by plaintiffs is that RFC was without statutory power to hold Common Stock of Maryland as security for its loans. This involves a construction of the Reconstruction Finance Corporation Act, under which RFC was organized and from which its powers are obtained. RFC contends that it has express power to hold Common Stock as security under the Act, but in any event its power in this respect is implied. Undoubtedly the loans were made under Sec. 605e, Title 15, Chap. 14, U.S.C.A., which authorizes the RFC "to subscribe for preferred stock of any class * * * in such insurance company, or to make loans secured by such stock as collateral * * *."

It would appear from this section that RFC was authorized to make loans only on Preferred Stock and that it was without authority to do so on Common Stock. This, however, is not the question before us for decision. Here, without dispute, the loans were made upon Preferred Stock and the question is whether, having taken such stock as security for its loans, it subsequently had the authority to convert it into Common Stock and hold the latter as security.

RFC relies upon other sections of the Act as giving it the express authority both to subscribe for and hold Common Stock as security. We think it is unnecessary to cite or discuss these other sections. It is sufficient to state that we have studied such sections and are of the belief that it is quite doubtful if they can be properly construed so as to sustain the contention of RFC in this respect.

The authority of RFC to convert its Preferred Stock, obtained by express authority contained in Sec. 605e (heretofore quoted), into Common Stock and to hold the latter as security for its loans must de-

pend in our judgment upon whether it had the implied power to do so. Plaintiffs argue that because RFC was not expressly authorized to make loans upon Common Stock it necessarily follows that it was without authority to convert the same into Common. It is asserted that an approval of such action would permit RFC to do indirectly what Congress has failed to authorize it to do directly. While, as stated, we find nothing in the Act which expressly authorizes RFC to accept or hold Common Stock as security, it is pertinent to note there is nothing in the Act which forbids such activity on its part.

No case has been cited and we find none construing the Act in respect to the point under consideration. There is a line of authorities, however, pertaining to an analogous situation which appear to support rather persuasively the implied authority of RFC under the instant circumstances to hold Common Stock as security.

These authorities have to do with the implied powers of national banks incidental to those expressly granted. In Atherton v. Anderson, 6 Cir., 86 F.2d 518, on page 525 (reversed on grounds not here material, 302 U.S. 643, 58 S.Ct. 53, 82 L. Ed. 500), the court stated: "* * * a bank may lawfully do many things in securing and collecting its loans, in the enforcement of its rights and in the conservation of its property previously acquired, which it is not authorized to engage in as a primary business." (Citing Calfornia Bank v. Kennedy, 167 U.S. 362, 17 S.Ct. 831, 42 L.Ed. 198, and other cases.)

In the Kennedy case, it was contended that a national bank was without authority to acquire stock of another corporation as security for a loan theretofore made. Admittedly it was without express authority to so do. The court, in discussing the matter, on page 366 of 167 U.S., on page 833 of 17 S.Ct., 42 L.Ed. 198, stated: "* * * but it has been held that, as incidental to the power to loan money on personal security, a bank may, in the usual course of doing such business, accept stock of another corporation as collateral, and, by the enforcement of its rights as pledgee, it may become the owner of the collateral * * *. So, also, a national bank may be conceded to possess the incidental power of accepting in good faith stock of another corporation as security for a previous indebtedness."

Other cases are cited which recognize this implied or incidental power of national banks.

Plaintiffs cite and rely upon First National Bank v. Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486, as a contrary holding. The fact is, however, that this case, in discussing the powers of a national bank, expressly recognizes (263 U.S. at page 656 44 S.Ct. at page 215, 68 L.Ed. 486) that "they can rightfully exercise only such as are expressly granted or such incidental powers as are necessary to carry on the business for which they are established." (Citing cases, including California Bank v. Kennedy, supra.) What the court did hold was that the express power to organize a national bank did not carry with it the implied power to establish a branch bank, which has little if any bearing on the instant question.

Plaintiffs, in attempting to meet the asserted implied power of RFC to convert, in their brief state: "It [RFC] purported to exercise the conversion privilege not for the purpose of enhancing its security or making itself whole on its loans, but for the sole purpose of enabling it to exercise effective voting control * * *."

This is an assertion which in our view is not justified by the record. True, no doubt, the purpose was to obtain voting control of the Common Stock but this is only a part of the story. It is equally true that such control was acquired and exercised so that RFC might better protect itself as the guardian of government funds which it had loaned to Maryland. Plaintiffs make a plausible argument that from the very nature of the situation RFC could not enhance its security by substituting Common for Preferred Stock. Certainly that must be true if we look only at the converted stock and close our eyes to the situation as a whole. It must not be overlooked, however, that only 29,487 shares of Preferred were converted out of a total of 174,487 shares held by RFC. It also should be kept in mind that the value of

the security held by RFC for the vast amount of money it had loaned to Maryland was dependent upon the income which the latter might produce. Control over its management and operation was therefore highly desirable. By exercising its right of conversion, such control was no doubt further extended. This was necessary or at any rate thought to be so in order to enhance its position as a security holder.

We therefore are of the view and so hold that RFC, having been expressly authorized to accept Preferred Convertible Stock as security, had the implied authority to convert such stock into Common when in its judgment it was advisable so to do in order to better protect and preserve the security which it held.

■ Our holding that the RFC had the authority to convert Preferred Stock into Common and the right to hold the same as security for its loans is in a large measure determinative of the numerous other contentions advanced by plaintiffs. It should be remembered that there is neither claim nor proof that RFC committed fraud against Maryland or its stockholders, and neither claim nor proof that any of the loans made to Maryland were used for any purpose other than its rehabilitation and the strengthening of its financial structure. It also should not be overlooked that RFC was a corporation not engaged in business for profit with the attendant motive oftentimes found to take advantage of those with whom it deals. On the other hand, it was an agency created by the government for the sole purpose, as far as we are aware, of rendering assistance by the use of government funds to those in financial need, not only for their benefit and protection but for the welfare of the country as a whole.

Notwithstanding, plaintiffs would have us believe that it was a colossal octopus performing in behalf of its own selfish interests and with a reckless disregard of the rights of those whom it was designed to save from financial disaster. We think the case should not be approached from such a basis. The Common stockholders at the time RFC made its first loans to Maryland and long thereafter were so far immersed in the sea of financial disaster that they were without hope. It was possible only through the heroic and hazardous efforts of RFC that the Common Stock later acquired value. Recognition by plaintiffs of this assertion is found in the fact that no complaint was made as to the activities of RFC from the time the first loans were made in 1934 until the refinancing program was proposed in 1942. By this time plaintiffs, having been saved from drowning, were not content to merely ride in the boat which had been so successfully navigated by RFC but decided to take over and row it for themselves.

Plaintiffs engage in a detailed argument designed to show that the refinancing plan of 1942 was unnecessary. We find no occasion to enter this discussion. It is sufficient, so we think, to point out that the trial court found to the contrary and the evidence, in our opinion, amply sustains such finding.

■ It is argued that the increase by RFC of Maryland's indebtedness by $12,-500,000 in 1942 was in breach of the fiduciary duties which RFC owed to the Common stockholders. In support of this argument numerous authorities are cited in support of the proposition that a pledgee is a fiduciary and that dominant stockholders whose controlling stock is not owned but merely held in pledge are also fiduciaries. We think no useful purpose could be served in discussing or analyzing these authorities for the reason, so we think, that they are without application. This is so for the reason, as we have held, that the RFC in making the 1942 loan acted in conformity with its agreement with Maryland, as was permitted by the latter's charter and also within the powers, either express or implied, granted it by Congress. Assuming, however, it sustained a fiduciary relation toward the Common stockholders, it also sustained, so we think, a fiduciary relation with the government whose funds it was loaning. We are of the view that the Common stockholders could only complain of a breach of duty owed them if RFC exceeded the powers with which it was vested. It owed the government the duty of exercising any and all powers with which it was vested for the protection of govern-

ment funds. Anything less would have been a breach of duty which it owed in this respect. Believing and holding as we do that it acted within the scope of its authority, we think it follows that its lawful activities could not be properly designated as a breach of duty owed the Common stockholders.

Lastly, it is contended that the terms of the 1942 refinancing were unfair, inequitable and illegal because (1) the plan included the issuance of 125,000 shares of new Preferred Stock for $12,500,000, for which the Common shareholders had the preemptive right to subscribe pro rata to the new shares in order to protect their financial interest against dilution; (2) the new Preferred Stock was made convertible into Common Stock at the ratio of 50 to 1; (3) the new Preferred Stock conferred 100 votes on each share; and (4) the new Preferred Stock was made callable only upon the consent of the holders of two-thirds of such stock.

While the 1942 plan is asserted to be illegal for the reasons just stated, no serious argument is made in support thereof. The argument is directed primarily at least to the contention that the plan was unfair and inequitable to the Common stockholders. Here again, plaintiffs are met with the finding of the court below to the effect that the plan was fair and equitable under the circumstances shown, and we see no reason why such finding should not be accepted by us.

Plaintiffs' most serious contention concerning the unfairness of the plan is based on the theory that the Common stockholders were deprived of their preemptive rights. Assuming that this is a general principle of corporation law usually recognized by the courts, it does not follow that Maryland was required to confer such rights upon its Common stockholders. There was no provision either in its charter or in the statutes of the State of Maryland which imposed a mandatory duty upon it in this respect. Both sides appear to agree that the rights of the Common stockholders are determinable by the law of the State of Maryland. Both sides rely upon the case of Thom v. Baltimore Trust Co., 158 Md. 352, on page 356, 148 A. 234, on page 235, wherein the court states: "Independently of the charters, however, the stockholders of a corporation have a preferential right to purchase new issues of its shares, to the proportional extent of their respective interests in the capital stock then outstanding, when the privilege can be exercised consistently with the object which the disposition of the additional stock is legally designed to accomplish."

The question at once arises as to whether the Common stockholders could have been allowed this privilege "consistently with the object which the disposition of the additional stock is legally designed to accomplish." As already shown, the object sought to be accomplished by Maryland was the acquirement of $12,500,000 as an aid to its financial rehabilitation. It is fantastic to think that it could have obtained this amount of money or any considerable portion thereof by a sale of Common Stock to its then existing Common stockholders. Plaintiffs assert that they had confidence in Maryland, citing the testimony of one of the plaintiffs to the effect that he offered to purchase 40,000 shares of Common Stock at $2.00 per share. The amount of the offer for Common Stock is predicated upon the fact that the Preferred Stock issued to RFC at $100.00 per share carried a conversion ratio of 50 Common shares for each Preferred share, hence, the value of a Common share was $2.00. But suppose Maryland had accepted the offer and issued the Common Stock as requested? It would have obtained a total of $80,000, an infinitesimal amount compared with the amount sought. We find nothing even to indicate that the objective sought by Maryland could have been achieved by such a procedure. Undoubtedly, the only possible source from which it could obtain such a large amount of money was through RFC, and in order to do so it was required by the latter to issue its Preferred Stock as security. In other words, Maryland did what it was required to do in order to obtain the loan from RFC, and the latter required as security what it was entitled to under the law.

Other terms relied upon by plaintiffs as showing the 1942 loan to be unfair and inequitable fall largely in the same category.

None of them were in violation of any positive provision of law. They were requirements which RFC had a legal right to impose as a condition to making the loan. Even though such terms might appear harsh, we are of the view that they furnish no justification for a court of equity granting the relief sought. In our judgment the lower court properly dismissed the complaint.

The decree appealed from is affirmed.