490 A.2d 756

**Frederick M. VALERINO, Sr., et al.**

v.

**Charles R. LITTLE, et al.**

**No. 1114, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

April 12, 1985.

Richard A. Reid and Laurel P. Evans, Towson (Royston, Mueller, McLean & Reid and Anthony J. Tampieri, Towson, on the brief), for appellants.

Herbert R. O'Connor, III and Cynthia M. Hahn, Towson (Cook, Howard, Downes & Tracy, Towson, on the brief), for appellees.

Argued before BISHOP, ALPERT and ROSALYN B. BELL, JJ.

ALPERT, Judge.

In this appeal we are asked to decide whether a notice of a board of directors meeting was sufficient to advise a director (who was also a stockholder) receiving the notice that a stock issuance could occur causing his proportionate control of a nonpublic corporation to be diminished from 50% to less than 25%.

The instant case comes before this Court on appeal from a decision by the Circuit Court for Baltimore County denying the plaintiff's (appellant's) petition for dissolution of Electra-Mechanical of America, Inc. Upon reconsideration of a motion to dismiss filed by appellees, the trial judge found that appellants had been properly notified of an impending special board of directors meeting wherein the corporation issued an additional 520 shares of stock. The issuance resulted in appellants' prior holding of 50% of stock being reduced to less than 25% of the corporation's outstanding stock and denied appellants the stock ownership required to have the right to request dissolution under § 3-413(a) of the Maryland Corporation and Association's article. The trial judge also found no evidence of fraud or oppressive conduct which would permit dissolution under § 3-413(b) of the same article.

On appeal, appellants contend that the court erred in determining that the notice of the special board of directors meeting was valid and in finding no evidence of illegality, oppressiveness or fraud.

### THE FACTS

As of April 1, 1979, appellants, Frederick M. Valerino, Theresa A. Valerino, Gregory R. Hays and Ann T. Hays owned 195 shares of Electra-Mechanical of America, Inc. (EMA); appellees, Charles R. Little and Anna R. Little also owned 195 shares. Charles R. Little, Anna R. Little and Frederick Valerino comprised EMA's Board of Directors. No stockholders meeting was held in 1980 and consequently this board was held over. On April 1, 1981, the stockhold-

ers were unable to elect a new board of directors; a dispute concerning the operation of EMA resulted in a stalemate. The minutes of that stockholders' meeting indicate that 390 votes were cast for Charles R. Little and Frederick Valerino and 195 votes were cast for Anna R. Little and Gregory Hays. Minutes of the Board of Directors' meeting held the same date indicate that Mr. Valerino was removed as Vice-President of EMA and that he "would prepare a Proposal offering to sell his shares of stock along with Mr. Hays to the Corporation...."

Following these meetings a special Board of Directors meeting was called and Frederick Valerino was advised by letter dated April 10, 1981, that a special meeting would be held on April 17, 1981. A stated purpose of the meeting was "[f]or the sale and purchase of the Capital stock of E.M.A., Inc. No proposal [would] be considered unless it [was] reduced to writing, signed, witnessed and notarized."

In response, Valerino sent a telegram to Charles Little stating that he and Mr. Hays were not then prepared to make a proposal for the sale and purchase of their stock; Charles Little acknowledged receipt of the telegram by letter dated April 13, 1981, and requested that Valerino "let us [the Board] know when you have prepared Proposals and we will have a Special Board of Directors Meeting at that time." Notwithstanding this letter and Valerino's absence, the Special Meeting was held as scheduled on April 17th. At that time, pursuant to a proposal made by the Littles, the members of the Board in attendance (the Littles) voted to issue an additional 520 shares of stock to be distributed as follows: 490 shares to the Littles; 10 shares to Joseph G. and Deborah L. Balog; 10 shares to Kevin and Karen L. Behan; and 10 shares to Charlene H. Little. As a result of the meeting, appellants' 50% share was reduced to less than 25%.

The Valerinos and Hays then filed this action requesting that EMA be dissolved. They argued below that the notice of the special meeting was insufficient to authorize the

issuance of the additional stock and that they, therefore, remained 50% shareholders who could petition for dissolution because of the stockholders' failure to elect a new Board for two consecutive years. Alternatively, they argued that the conduct of the Board was illegal, fraudulent and oppressive and, therefore, entitled them to petition for dissolution.

## THE PROCEEDINGS

The trial judge initially decided that the notice of the meeting dated April 10, 1981, was inadequate because it failed to comply with the notice provision contained in EMA's by-laws. Upon reconsideration, however, the judge reversed himself and determined that the notice was adequate because he found that the meeting was to consider the sale and purchase of stock and that "any intervening correspondence could not be reasonably interpreted as notice of cancellation of the meeting." The trial judge concluded that appellants, "in all due prudence, should have been at the ... meeting in order to protect their rights." He also found nothing illegal, fraudulent or oppressive in calling the special meeting inasmuch as appellants were properly notified of it.

On April 26, 1983, appellants timely moved for reconsideration or, in the alternative, a new trial. On May 23, 1983, both motions were denied and this appeal followed.

### A. *Notice*

Appellants contend that the notice was insufficient because the notice told only of the sale and purchase of stock and not the issuance. They argue that the *"purchase and sale* of stock refers to stock already in the hands of shareholders which is transferred." (emphasis in original). They rely on the distinction drawn in the Maryland Code and EMA's charter between the purchase of outstanding, already issued stock and the issuance of new stock.

### 1. *Maryland Code*

Section 2–201(a)(1) [1] empowers a corporation to *issue* "stock of any class authorized by its charter." Assuming the corporation's charter permits the issuance of stock without stockholder approval, §§ 2–203 and 2–204 provide that the issuance requires a Board resolution which authorizes the issuance, sets the price and describes the consideration.

Section 2–310 concerns the corporation's purchase of stock and permits the corporation to acquire shares of its own stock by *purchase* provided that it is not prohibited or otherwise restricted by the corporation by-laws or charter. Section 2–311 places limits upon the corporation's purchase or acquisition of its own stock.

Section 2–312 permits a corporation, absent charter restriction, to *sell* its own stock which had been acquired by the corporation through the *purchase* of outstanding shares.

### 2. *Charter and By-Laws*

EMA's charter provided that the authorized stock of the corporation is 10,000 shares of common stock with a par value of $10.00 per share. It also empowers the Board to authorize the issuance of the stock subject to the restrictions in the by-laws.

Article III, Section 6 of the by-laws provides that notice of a special meeting *"stating in detail* the time, place and *purpose* thereof, shall be mailed to each member of the Board ... not less than seven (7) days prior to the date set for the special meeting." (emphasis added).

Neither the charter nor by-laws appear to restrict the corporation's ability to purchase its own shares. Section 4 of Art. V of the by-laws does, however, differentiate between the *issuance* and *transfer* of the corporation's stock.

---

1. All statutory references are to Md.Corp. and Assoc.Code Ann. (1975).

### THE LAW

■ Where the sufficiency of notice is complained of, courts have acknowledged that notice must be given to all directors so that the corporation may benefit from the counsel and advice of all. In the absence of proper notice, any action of the Board is invalid unless later ratified by the absent directors and thus waived by them. *See State ex rel. Howeth v. D.A. Davidson & Co.*, 163 Mont. 355, 517 P.2d 722 (1973).

As early as 1905 it was acknowledged by the Court of Chancery of New Jersey that notice of a special meeting is not only proper but necessary and "that such notice should state *fully* the object of the meeting, so that each director may be informed in advance and fully appreciate the importance of his personal attendance." *Wall v. Utah Copper Co.*, 62 A. 533, 536 (N.J.1905) (emphasis added). In *Wall* the notice provided that a purpose of the meeting was "[t]o consider the advisability of, and, if deemed advisable, to authorize *an issue and sale* of $3,000,000 par value bonds...." *Id.* at 534 (emphasis added). The objection to the notice was that it did not advise the directors of a $1,500,000 stock issue. While refraining from expressing "any definite opinion on the subject," *id.* at 536, the court indicated that the directors should have been advised of an increase in capital stock.

In *Bourne v. Sanford*, 327 Mich. 175, 41 N.W.2d 515 (1950) notice of a special meeting was sent to the directors indicating that the purpose of the meeting was to "discuss ... and analyz[e] ... financial and legal problems which faced the corporation and for the purpose of authorizing ... any action which might be necessary for the solution of such financial and legal problems...." *Id.*, 41 N.W.2d at 519. At the meeting, however, it was decided that a petition for dissolution of the corporation should be filed. This decision was challenged by the absent director. The court found that it was "very significant that the notice was devoid of any mention of dissolution or receivership proceedings." *Id.* The court, in ordering the dismissal of the

petition for dissolution, found the notice given inadequate in that it should have advised the directors that "dissolution and receivership was the contemplated matter for consideration." *Id.* at 522.

The adequacy of the notice regarding the purpose of a directors' meeting was also addressed in *In Re Wm. Faehndrich, Inc.*, 2 N.Y.2d 468, 161 N.Y.S.2d 99, 141 N.E.2d 597 (C.A.N.Y.1957). In *Faehndrich* the notice advised that the meeting was "for the purpose of electing directors of the corporation for the ensuing year, or for such action on further business, as may arise at said meeting." *Id.*, 161 N.Y.S.2d at 101, 141 N.E.2d at 599. At the meeting the director who was not in attendance was ousted by his son and daughter-in-law who elected themselves directors and terminated the absent director's employment. The court, in upholding the action taken at the meeting, held that:

> The notice of the stockholders' meeting, admittedly received, fairly and adequately apprised the petitioner of the purpose of the meeting; in so many words, it recited that the meeting was called 'for the purpose of electing directors'. It is *quite likely that the father did not fully realize the significance of such an election or the consequences to himself that would flow therefrom, but it may not be said that the notice of the meeting was insufficient or misleading in any way.* If the purpose of the meeting be clearly stated, there generally is no duty to specify the course of conduct contemplated by the directors after their election, and no requirement to explain the consequences that will follow from the action they plan to take.

*Id.*, 161 N.Y.S.2d at 102, 141 N.E.2d at 600 (emphasis added) (footnote omitted).

Unfortunately, there are no cases which squarely address the issue presented herein, *i.e.*, whether notice of sale and purchase of stock may reasonably be interpreted to include the issuance of stock. Therefore, the notice given must be

scrutinized to see if it clearly states the purpose of the April 17th meeting.

The notice to Mr. Valerino states that the purpose of the meeting would be: "2. For the sale and purchase of the Capital Stock of E.M.A., Inc." Mr. Valerino contends that this did not properly advise him of the issuance of EMA stock.

The word "issue" in this context appears to be a term of art. It refers to putting stock into circulation. 11 Fletcher, *Cyclopedia Corporations* § 5159 (1971 Rev.Vol.).

The word "purchase" also appears to be a term of art when discussed in the context of a corporation's buying of stock. The word in this context refers to the redemption of outstanding, already issued stock. *Id.* at § 5148.

The ambiguity in the notice in the case *sub judice* is found in the word "sale." If the "sale" of stock means the issuance of stock, notice was adequate; if, on the other hand, "sale" refers only to outstanding stock which the corporation has redeemed (purchased) but not yet retired, then the notice received by Mr. Valerino was inadequate.

In *Ruffer v. Sophie Mae Candy Corporation*, 35 Ga.App. 114, 132 S.E. 396 (1926) the latter meaning was held to be correct. There, the Court of Appeals of Georgia indicated that a corporation *purchases* and *sells* outstanding stock. The "sale" there was interpreted to refer to the transfer of already issued stock, not the issuance of authorized but unissued stock.

On the other hand, the Court in *Ruckle v. Roto American Corp.*, 339 F.2d 24 (2d Cir.1964), clearly stated that "the issuance by a corporation of its own shares is a 'sale.'" *Id.* at 27. This is stated, however, in the context of defining the applicability of the anti-fraud provisions of the federal securities laws. While stating that the two terms are synonymous, the case nonetheless contemplates a two-step process. First, the directors were to approve the issuance of Roto American stock, then the shares were to be "resold" to the defendant. The suit was to enjoin the sale to

the defendant. *See also Simon v. New Haven Board & Carton Co.,* 250 F.Supp. 297, 299 (D.Conn.1966); *Wall v. Utah Copper Co.,* 62 A. 533 (N.J.1905).

■ When stock is issued, it is issued to an individual shareholder in exchange for consideration. "Issued shares are such of the authorized shares as have been issued to shareholders." H. Henn, *Law of Corporations,* § 158 (2d ed. 1970). *See also* 11 Fletcher at § 5159. Logically, this process necessarily contemplates a two-step transaction. *See Wall,* 62 A. 533 (N.J.1905). First the stock is issued, then it is sold. The two steps necessarily occur contemporaneously. If the stock remains unissued, it cannot be sold; on the other hand, if the stock remains unsold there is no need to issue it. It is impossible to issue stock without the concommitant sale; it is, however, nonetheless possible for a corporation to sell stock without the contemporaneous issuance of it. A corporation may sell stock which has already been issued and is being held by it as treasury stock. *Id. See also* 11 Fletcher at § 5088. Treasury stock is stock which is authorized and issued but not outstanding. *Id. See also* 11 Fletcher at § 5088.

■ In the instant case this ambiguity raised by the notice which states that stock will be purchased and sold can only be resolved by a consideration of the circumstances under which the notice was received. The notice was received after the Valerino/Hays group indicated a willingness to have the corporation buy them out. They, apparently, were to prepare a proposal to be submitted to the Board. When the notice was received, Mr. Valerino advised the Board, through Mr. Little, that he was not yet prepared to make a proposal. Mr. Little's response was to advise Mr. Valerino that when the proposal was prepared, the meeting would be held. At that time Mr. Valerino was unaware of any other proposals pending before the Board. Given these circumstances, it was reasonable to conclude that the "purchase and sale" referred to in the notice concerned the corporation's purchase of and the Valerino/Hays group's

sale of EMA stock. Had the notice advised of the possible issuance of stock, Mr. Valerino would have been alerted of the attempt to defeat his ability to petition for involuntary dissolution. We hold the notice was invalid.

Additionally, conspicuously absent from the correspondence is notice to Mrs. Valerino and Mr. and Mrs. Hays, as shareholders, of their preemptive rights to take proportionally in the new issue. This may be indicative of the fact that the issuance was not contemplated when the notice to Mr. Valerino was originally sent and would support the reasonableness of Mr. Valerino's interpretation of the notice.

Arguably, according to the appellees, no notice was necessary because no preemptive rights existed in the Valerino/Hays group. While Maryland law recognizes preemptive rights, § 2–205(a)(8) provides that preemptive rights do not exist if their applicability is "impracticable" unless the charter provides otherwise. Unfortunately, the term "impracticable" is not defined by the Code. The only Maryland case addressing the impracticability of preemptive rights arises in the context of a building association in which the court found that "preemptive rights [were] not strictly applicable." *Poole v. Miller,* 211 Md. 448, 462, 128 A.2d 607 (1957).

In *Poole,* notwithstanding the fact that pre-emptive rights were not strictly applicable, the Court found that they were impracticable. The Court discussed the need for a constant source of new capital in the area of building associations and concluded that according existing shareholders preemptive rights would hamper operation of the association.

Appellees rely on *Poole* to argue that here, as there, preemptive rights are impracticable because according the Valerino/Hays group a right to take in the issuance would defeat the purpose of it; *i.e.,* to break the deadlock and save EMA from dissolution.

■ Generally, however, this right is subject to "the general restriction that its exercise must be consistent with

the object which the stock increase is legally designed to accomplish." 18 Am.Jur.2d, *Corporations* § 278 (1965). In *Todd v. Maryland Casualty Co.*, 155 F.2d 29 (7th Cir.1946), the Court, in applying Maryland law, acknowledged that ordinarily a shareholder has preemptive rights to a new issuance. It found, however, that exercise of them under the circumstances of the case was not "consistent with the object which the disposition of the additional stock [was] legally designed to accomplish." *Id.* at 39. In *Todd* the insurance company needed to raise an additional $12,500,000 for the lawful purpose of financial rehabilitation. The Court found that the exercise of preemptive rights in this context would not have achieved the objective sought by the insurance company.

■ Applying *Todd* to the case *sub judice*, it appears that the exercise of preemptive rights here would, as appellees suggest, defeat the objective of the issuance and thus be impracticable, assuming *arguendo* that the issuance was valid.

The objective of the issuance is in dispute. Appellees assert that they merely wished to avoid dissolution and its consequential disastrous fiscal effects. Appellants, on the other hand, contend that appellees were solely motivated by the desire to remove appellants as equal participants in the corporation's affairs.

We believe that determination of the validity of the issuance, as it would relate to the question of preemptive rights, involves a mixed question of law and fact which would, of necessity, be decided by the trial court. *See Schwartz v. Marien*, 37 N.Y.2d 487, 373 N.Y.S.2d 122, 335 N.E.2d 334 (1975). Because we have already determined that the notice to Mr. Valerino as a director was invalid, we need not remand this issue to the trial court for determination.

### B. *Fraud, Oppressiveness, Illegality*

■ In the petition for dissolution, it is averred that EMA funds were being distributed to Adams Electric, Mr. Little's

personal company, at times when there was no contract between the two and no work being done by Adams. Appellants argue on appeal that these allegations entitled them to a trial on the merits with respect to these contentions. Appellees argue that appellants waived any consideration of these allegations of fraud when they argued only that holding the April 17th meeting without notice was fraudulent, illegal or oppressive. The record belies this argument. In the original trial on the merits the court decided that notice was invalid, thus rendering the question of oppressiveness, illegality and fraud moot and dispensing with proof thereon. When, on appellees' motion for reconsideration, the court reversed itself and decided that the notice was valid, those questions again became germane; in fact, the court held sub curia the questions of fraud, illegality or oppressiveness without hearing further evidence. Several months later the trial court filed a "Memorandum Opinion and Order" finding that "there was no illegality in the stock issuance" and that "[t]he Directors' stock issuance to prevent the corporation's involuntary death" was not fraudulent or oppressive. Appellants moved for reconsideration of that Opinion and Order and raised the issue again at the hearing on their motion, but the court, apparently on the ground of relevance, rejected their argument and attempt to offer evidence. Such evidence, the court felt, would not affect the court's finding that the issuance of the stock, upon proper notice to Mr. Valerino, was not illegal, oppressive or fraudulent.

We believe that, under the peculiar procedural posture of this case, the trial court abused its discretion. By reversing its initial decision, it became necessary to afford appellants the opportunity to present further evidence in support of their allegations of fraud, oppression or illegality. Commingling of funds, or fraudulent transactions with other companies which are owned by a director, have been held to be sufficiently illegal, oppressive or fraudulent to order dissolution. Note, 28 Md.L.Rev. 360, 368 n. 43 (1968). Consequently, the court should have heard evidence on these allegations.

In *Lynch v. Buchanan,* 37 Md.App. 413, 377 A.2d 592, *cert. denied,* 281 Md. 740 (1977), a shareholder in a professional corporation filed a petition for dissolution averring that a director had made loans of corporate monies to his wife, had given himself a bonus and had held stockholder meetings without notification to other stockholders. In acknowledging the extraordinary remedy of dissolution, we noted that:

> Nothing connected with the normal internal disputes between the shareholders is to be made the subject of a bill by some one shareholder in behalf of himself and others, unless there is something illegal, oppressive or fraudulent—unless there is something *ultra vires* on the part of the company, *qua* company, or on the part of the majority of the company, so that they are not fit persons to determine it.

*Id.,* 37 Md.App. at 417–18, 377 A.2d 592 (quoting *Williams v. Ice Co.,* 176 Md. 13, 26, 3 A.2d 507 (1939)). In adopting the trial court's opinion, we held that:

> [W]here directors or shareholders act in such a way to use their positions to advance their own individual interests as distinguished from that of the corporation or acquire interest[s] that may conflict with the clear and proper discharge of their duties that transaction is not ipso facto void but conversely it is not necessary to establish that there has been actual fraud practiced by the party holding the confidential or fiduciary relationship. The proof is upon that director or shareholder once it is shown that he has dealt in a way to perform his own interest to show the fairness and adequacy of the transaction. In other words, the burden of going forward shifts.

*Id.,* 37 Md.App. at 419, 377 A.2d 592.

■ In the case *sub judice* appellants allege that appellees used their position to their own advantage by causing payments to be made by EMA to Adams Electric and to themselves personally. If appellants had been able to offer evidence of their conduct, our holding in *Lynch* would

compel appellees to show the fairness of these transactions. In *Lynch* the director was able to show the fairness of his actions and we, in turn, found nothing illegal, fraudulent or oppressive in them. If, however, unlike *Lynch*, appellees were unable to prove the fairness of these transactions, *i.e.*, payments to Adams Electric and to Mr. Little, this self-dealing would allow dissolution on the basis of the director's fraudulent, oppressive and illegal conduct. *See also* Annot., *Corporate Dissolution—Oppressive Conduct,* 56 A.L. R.3d 358 (1974).

■ Because we have determined that the initial notice to Mr. Valerino was invalid, appellants remain 50% shareholders in EMA, Inc. Since the record indicates that the trial judge found, *inter alia,* that no new board had been elected for two consecutive years, appellants have satisfied the criteria for involuntary dissolution set forth in § 3–413(a)(2). On remand, the trial court, therefore, need not concern itself with appellants' allegations of illegality, fraud or oppressiveness; however, the trial court must conduct further proceedings consistent with granting appellants' petition for involuntary dissolution.

JUDGMENT REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; APPELLEES TO PAY THE COSTS.