676 F.2d 81
 117 L.R.R.M. (BNA) 2291, 36 Fair
Empl.Prac.Cas. 1131,
28 Empl. Prac. Dec. P 32,652, 93 Lab.Cas. P 13,458
 Archie PETERSON and Robert Doster, individually and on
behalf of a class of all others similarly situated
v.
The LEHIGH VALLEY DISTRICT COUNCIL, UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS, an unincorporated Labor Union and
General Contractors Association of Lehigh Valley, Inc. and
Local No. 368 (Carpenters) and Walter D. Fries, Individually
and as Business Agent for Lehigh Valley District Council,
United Brotherhood of Carpenters and Joiners and Fred
Miller, Individually and as Shop Steward for Local No. 368
and John Larsen, Individually and as Apprentice Co-Ordinator
for the Lehigh Valley District Council, Carpenters and Joiners.
 No. 81-1884.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 4, 1982.
Decided April 8, 1982.
As Amended May 5, 1982.
 
 Charles W. Bowser (argued), William H. Bishop, Leonard Schaeffer, Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for Archie Peterson and Robert Doster.
 Charles W. Johnston, Jr. (argued) Handler & Gerber, P. C., Harrisburg, Pa., for Lehigh Valley District Council, United Brotherhood of Carpenters and Joiners, Local No. 368, Walter D. Fries, Fred Miller, and John Larsen.
 Sally Akan (argued), Pamela L. Perry, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for General Contractors Assn. of Lehigh Valley, Inc.
 Before GIBBONS, WEIS and GARTH, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In this civil rights case, two men hired as carpenter apprentices charge that they lost their jobs because a union, motivated by racial discrimination, refused them membership or admittance into an apprenticeship training program. The district court granted summary judgment to the union and contractor defendants because no applications for the program were being accepted at the relevant times and plaintiffs had failed to file the prescribed written forms. We vacate the judgment because there are disputed issues of fact with respect to discriminatory standards for union membership, and possible joint control of the training program by defendant contractor association.
 
 
 2
 Plaintiffs filed complaints in the district court against a contractors association, district council, and local union alleging violations of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (1976), the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Labor Management Relations Act, 29 U.S.C. § 185 (1976). After discovery, the district court granted summary judgment.[1] Plaintiffs appeal.
 
 
 3
 In 1972, the G & Q Drywall Company, a Cleveland-based organization, was awarded a construction subcontract for a public housing project in Allentown, Pennsylvania. Kenneth Barbarino, the company supervisor, asked Carpenters Union Local 368 to supply some minority journeymen or apprentices so that G & Q could meet affirmative action hiring requirements under the federally funded contract. When he was informed by the Local that no minority craftsmen were available, Barbarino contacted the local Opportunities Industrialization Center and hired two of their trainees, Peterson and Doster, as carpenter apprentices.
 
 
 4
 G & Q had agreed to abide by the collective bargaining agreement negotiated by the General Contractors Association of Lehigh Valley, Inc. and the Lehigh Valley District Council of the United Brotherhood of Carpenters and Joiners. As its name implies, the General Contractors Association is an affiliation of construction companies in the area. The Association, which G & Q joined, acts as the collective bargaining agent for its member employers. The District Council is composed of a number of carpenter unions, including No. 368, the local which had jurisdiction over the G & Q project. The collective bargaining agreement, which governs employment conditions, did not include an exclusive hiring hall agreement.
 
 
 5
 The General Contractors Association and the District Council had also established an apprenticeship training program, through which individuals could learn the carpentry trade and become members of the union. A joint committee determined whenever there was a sufficient employment demand in the industry to warrant admitting individuals to the program. When there was not enough work in the area, the training program was suspended.
 
 
 6
 Admission into the union was virtually guaranteed once an applicant was accepted into the apprenticeship program. Individuals who already possessed carpentry experience to qualify as journeymen could also be admitted to the union in that status without further training.
 
 
 7
 In March 1972, when Peterson was hired, Council business agent Walter Fries threatened to close down the job because Peterson had not been hired through the union. When advised that he might be violating a local ordinance, Fries relented and Peterson began to work. He remained on the job for the next fifteen days, despite harassment and racial epithets from his fellow workmen, but was discharged on March 16, 1972-allegedly for tardiness. Doster was hired about the time of Peterson's discharge and stayed until April, when he was laid off by G & Q, with the stated reason being lack of work.
 
 
 8
 On the record before it, the district court concluded that the plaintiffs had failed to establish a prima facie showing of discrimination, because neither demonstrated that he qualified for admission to the apprenticeship program or the carpenter's union. That is, both men failed to request entry into the apprenticeship program in the prescribed manner-by written application. Moreover, there were no openings in 1972, so applications were not accepted from anyone. As the court viewed the facts, G & Q was solely responsible for the plaintiffs' discharge, and no claim was asserted against it in this litigation because of a previous settlement.
 
 
 9
 Plaintiffs' claim against the union for lack of fair representation under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, also was found lacking in proof. The court reasoned that the collective bargaining unit consisted of "foremen, journeymen and apprentices" and, since the plaintiffs did not fall in any of those categories, the union owed no duty of representation. Moreover, since the collective bargaining agreement was between the Contractors Association and the District Council, not Local 368, the court concluded there was no contract obligating the local union to represent plaintiffs.
 
 
 10
 On appeal, plaintiffs contend that there are sufficient inferences which may be drawn from the undisputed facts, as well as positive evidence in the record, to demonstrate that defendants discriminatorily denied Peterson and Doster admission to the union and apprenticeship program. Defendants' conduct, it is also charged, caused plaintiffs' discharge from employment with G & Q. Finally, plaintiffs assert the union refused to represent them in their grievance against the employer.
 
 
 11
 To be entitled to summary judgment, a party must demonstrate that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Any reasonable inferences from the facts must be resolved in favor of the party against whom the judgment is entered. Betz Laboratories, Inc. v. Hines, 647 F.2d 402, 404 (3d Cir. 1981).
 
 
 12
 Summary judgment is a useful procedure when there is no dispute about the critical facts and it serves to eliminate the expense and delay of unnecessary trials. However, when there is a disagreement about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties.
 
 
 13
 Our role, then, is to explore the record to determine whether plaintiffs have support for their position and could prevail if the fact finder resolves issues of credibility in their favor. In that task here, we must appraise the facts in a manner most favorable to Peterson and Doster.
 
 
 14
 Essentially, plaintiffs contend that Barbarino, G & Q's supervisor, was eager to give them employment and an opportunity to learn the carpentry trade, but the union and its members on the job set out to frustrate those aims. The union business agent repeatedly ignored requests to produce applications for membership in the union or even to give information about the apprenticeship program to the plaintiffs, although admittedly he would have done so for white employees. The carpenters at the construction site refused to work with Peterson and Doster and thus forced Barbarino to find assignments where they could work alone. Ultimately, union-orchestrated tension at the construction site made it necessary for Barbarino to discharge plaintiffs on pretext, a fact which he candidly confessed. The verbal abuse and mistreatment to which plaintiffs were subjected by their co-workers and union officials belie defendants' denial of racial discrimination as the union's motive.
 
 
 15
 There is ample record support for plaintiffs' claims. In his deposition, Peterson said:
 
 
 16
 "Mr. Fries, I understand, was introduced as the business agent for Local 368 and he attempted to deny me the right to work on the job and admittance as an apprentice in that carpentry trade and as a member of that local and he refused to give me assistance in the rate of pay that I should receive or information regarding the apprenticeship program and he also stated that he would not be responsible for me on the job in any manner whatsoever, which at that time I felt was an-and in the tone he said it was almost a physical threat.... Mr. Fred Miller (the union steward) refused to give me any information or help me to obtain information on being involved in the apprenticeship program and entrance into the local union and he overtly denied and made racist remarks to the fact that he would not be responsible for any assistance into the union and that the only card that I would receive would be a deck of cards and some dice."
 
 
 17
 Barbarino's testimony also details the hostile reception and uncooperative attitude exhibited by the union. Although he asked Fries on several occasions to prepare papers for Peterson, and later Doster, Fries was always evasive, saying only "we are looking into it." Barbarino also unsuccessfully requested help from the general contractor, the contractors association, the minority compliance officer for G & Q, and someone from OIC to combat the racial problem at the site.
 
 
 18
 Peterson was finally told by Barbarino that he could no longer stand the pressures from the union and would have to let plaintiff go. Barbarino conceded that it was tension at the job site, not tardiness, that caused him to discharge Peterson and that no sanctions were applied to a white carpenter apprentice who was also late on occasion.
 
 
 19
 Barbarino testified that he was very pleased with Doster's work and progress. But since none of the white journeymen would work with him, Barbarino had to assign Doster to jobs that he could do alone and when there was no more solo work, was forced to let him go. Although part of the refusal was apparently due to racial animosity, the fact that Doster was not a union member also contributed to the problem.
 
 
 20
 The lack of union membership for Doster and Peterson, however, must be attributed to the council and the local. Article XIX of the Collective Bargaining Agreement provided that an apprentice who was hired and was not a member of the union, "shall as a condition of continuing employment, prior to but not later than the eighth day of employment, file an application for membership with the council, and pay the council a monthly permit until the application is processed." Despite repeated requests by Barbarino to prepare application forms, the union business agent and steward did not do so, although both plaintiffs remained on the job for more than eight days.
 
 
 21
 Excerpts from the deposition of business agent Walter Fries explain the procedure for entry into the union by an individual who secures employment before becoming a union member.
 
 
 22
 "Q. How do you become a member of the Carpenters Union?
 
 
 23
 A. Well, by being hired on the job by a contractor. It is the policy that after seven days, if the man asks for an application, we give him an application.
 
 
 24
 Q. In 1972, if an individual was employed by a contractor and after seven days he was doing all right by the contractor and you had no complaints and he asked for an application, would he have to go through any procedure in becoming a union member besides paying dues?
 
 
 25
 A. No.
 
 
 26
 Q. Did he have to fill out any forms to become a member of the union?
 
 
 27
 A. Just the application.
 
 
 28
 Q. Would he have to go to a specific office to do that or could he do that on the job site?
 
 
 29
 A. He could do that on the job site.
 
 
 30
 Q. Who would be responsible for getting him those papers?
 
 
 31
 A. The agents.
 
 
 32
 Q. If a person was working on a job site and was employed by a contractor and, thereafter became a member of the union and requested entry into the Apprenticeship Program and you were not taking members at the time, in 1972, would you have kept his name on file so that when there was a vacancy into the Apprenticeship Program he would be selected?A. He would be told when it would be open.
 
 
 33
 Q. Do you keep applications on file for the Apprenticeship Program?
 
 
 34
 A. The chairman does."
 
 
 35
 That testimony shows that plaintiffs should have been permitted to apply for membership in the union after working on the job for seven days. Requests for these applications were not only made by them, but by their supervisor as well. Additionally, Fries' testimony supports an inference that after plaintiffs joined the union, they could then apply for admission into the apprenticeship program-even if there were no openings at that time-and wait for the next available vacancy.
 
 
 36
 This and other evidence of discrimination by the union defendants makes entry of summary judgment in their favor inappropriate. The record demonstrates disputed matters of material fact with respect to the counts based on section 1981 and Title VII.
 
 
 37
 We have found no evidence that the General Contractors Association participated in the hiring or firing decisions and policies of G & Q Drywall, Inc. There is no basis for inferring any association activity leading to the discharge of plaintiffs. There is, however, one potential ground of liability, not fully developed in the record, which bars summary judgment at this stage as to the contractors association.
 
 
 38
 Responsibility for policies and recruitment in the apprenticeship program is vested in the Lehigh Valley Carpenters Joint Apprenticeship and Training Committee (JATC), which is comprised of three members of the district council and three members of the contractors association. It is this committee that determines when the program will be active. The contractors association disclaims responsibility for the plaintiffs' failure to be admitted to the program, arguing that plaintiffs neither made a written application nor contacted any member of the association. There are other considerations, however, which have a bearing on the association's potential liability.
 
 
 39
 Walter Fries, the business agent for the council, was also a member of the apprenticeship committee in 1972-74. Despite repeated requests by plaintiffs and Barbarino for information about entry into the program, Fries steadfastly refused to cooperate. Whether he may be considered an agent for the contractors association with respect to his role in the apprenticeship committee is a matter which is not clear. If Fries were found to be an agent for JATC, then the liability of the contractors association as a joint participant in the program would be called into question.
 
 
 40
 The record also raises an issue about the liability of the association with respect to its failure to assist with plaintiffs' admission to the program after Barbarino asked for help from the employers group. As mentioned earlier, when Barbarino was unable to secure information from Fries, he also called the contractors association, but no assistance was forthcoming. When inferences from the present record are viewed in the light most favorable to the plaintiffs, possible liability of the contractors association may not be excluded.[2] Hence it was error to enter summary judgment in the association's favor on the § 1981 count.
 
 
 41
 The remaining counts against the defendants are based on § 301 of the Labor Management Relations Act. 29 U.S.C. § 185. That section imposes upon the union, as the exclusive representative of the company's employees, a duty of fair representation in the event there is a dispute with the employer arising under the collective bargaining agreement. Findley v. Jones Motor Freight, 639 F.2d 953, 957 (3d Cir. 1981). The union's obligation is to serve employee interests without hostility or discrimination, exercise its discretion in good faith, and avoid arbitrary conduct. Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967).
 
 
 42
 Union membership is not a prerequisite for representation, Del Casal v. Eastern Airlines, Inc., 634 F.2d 295, 300 (5th Cir. 1981), but as the district court observed, plaintiffs must show that they belong to the bargaining unit in order to benefit from the union's duty. The unit here consists of carpenter foremen, journeymen, and apprentices. As the district judge saw it, since plaintiffs did not properly apply for admission into the apprenticeship program, and would not have been admitted in any event, they were not members of the bargaining unit.
 
 
 43
 We take a different view of the plaintiffs' status. Barbarino testified that he hired Peterson and Doster as carpenter apprentices. As such, they came under the terms of the collective bargaining agreement. Participation in the apprenticeship program is not mentioned as a requirement for a worker to be considered within the bargaining unit, although the defendants attempt to treat the two as inseparable. Their definition of the bargaining unit is unnecessarily restrictive. See Abilene Sheet Metal, Inc. v. N. L. R. B., 619 F.2d 332, 346-47 (5th Cir. 1980).
 
 
 44
 Even assuming plaintiffs were within the appropriate unit, defendants somewhat disingenuously contend that they still did not owe plaintiffs a duty of fair representation, because no violation of the bargaining agreement was alleged. This assertion fails on two grounds. First, Peterson and Doster's complaint against G & Q was that they were being paid less than the wages provided by the collective bargaining agreement. Article XIX of the contract provides that non-member apprentices "are to receive the same rates, conditions and fringe benefits set forth herein" until they are admitted into the union. Clearly, a violation was alleged under the contract.
 
 
 45
 Second, plaintiffs contend that the union and council breached the duty of fair representation because the conduct of the union and council was racially discriminatory, itself a breach of the union's obligation. It was in such a context that the duty of fair representation evolved. See, e.g., Steele v. Louisville & N. R. R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). See also, 6 T. Kheel, Labor Law § 28.02. Hence, plaintiffs assert that because of an "irrelevant and invidious" distinction, they were not treated fairly by the union, and this "hostile discrimination" ultimately resulted in their termination. 323 U.S. at 203, 65 S.Ct. at 232, Article III-(I) of the collective bargaining agreement provides that there "shall be no discrimination due to ... race...." If plaintiffs were discharged because of their race, then the employer breached the contract-and the union was obligated to represent these employees fairly, during their employment and after they were terminated.
 
 
 46
 Finally, the union defendants seek to avoid liability under § 301 by relying on the fact that plaintiffs reached a settlement with G & Q. Plaintiffs initially brought their wage claim before the Allentown Human Relations Commission and a conciliation agreement was reached. The defendants assert that their liability, if any, would be secondary to that of G & Q; accordingly, the settlement with the party primarily responsible necessarily releases them as well. This argument takes an erroneous view of § 301 obligations.
 
 
 47
 It is true that proof of the union's breach of its duty requires a finding that the employer violated the contract, Vaca v. Sipes, 386 U.S. at 187, 87 S.Ct. at 915, but this does not mean that the union's dereliction is secondary. The union is held responsible for its own wrongful conduct, that is, failure to fulfill a duty owed to the employee-and its liability on this basis is independent of the employer's. This obligation explains the difference between the damages attributable to the union's breach and the employer's wrongful conduct once liability is determined. As the Court said in Vaca v. Sipes :
 
 
 48
 "A more difficult question is, what portion of the employee's damages may be charged to the union: in particular, may an award against a union include, as it did here, damages attributable solely to the employer's breach of contract? We think not. Though the union has violated a statutory duty ... it is the employer's unrelated breach of contract which triggered the controversy and which caused this portion of the employee's damages.... With the employee assured of direct recovery from the employer, we see no merit in requiring the union to pay the employer's share of the damages.[18]
 
 
 49
 The governing principle, then, is to apportion liability between the employer and the union according to the damages caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's (breach) should not be charged to the employer."
 
 
 50
 386 U.S. at 197-98 & n.18, 87 S.Ct. at 920-921 & n.18.
 
 
 51
 Hence, the settlement between the plaintiffs and G & Q is relevant only in regard to the claim that the union's conduct caused the wrongful discharges by the employer. If this were proved, then the union and the company could be found jointly and severally liable.
 
 
 52
 But the union is also liable for losses that plaintiffs may have suffered because of breach of the duty of fair representation. Del Casal v. Eastern Airlines, Inc., 634 F.2d at 301. An award against the union would be appropriate for those expenditures flowing from its own wrongful conduct, such as attorneys' fees, court costs, and other expenses incidental to the employees' efforts to recover against the employer. Milstead v. International Brotherhood of Teamsters, 649 F.2d 395 (6th Cir. 1981); Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61, 620 F.2d 439, 443-44 (4th Cir. 1980). Whether such expenses were incurred here has not been developed on the record.
 
 
 53
 Local 368's argument that it does not owe any statutory duty to plaintiffs because it was not a party to the collective bargaining agreement is unclear. Local 368 and six other carpenters unions banded together and formed the District Council, which in turn, negotiates contracts on behalf of its member unions. Since they are part of the council, it is unlikely that the locals can disavow such agreements and deny representation of the covered employees. The scope of the agreement between the locals that constitute the council is not discussed in the district court's opinion. Since the relationship between the council and the local is undetermined, summary judgment should not have been granted as to Local 368 on the § 301 claim.
 
 
 54
 Accordingly, the judgment of the district court will be vacated and the matter remanded for further proceedings consistent with this opinion.
 
 
 55
 GARTH, Circuit Judge, concurring in part and dissenting in part.
 
 
 56
 While I am forced by virtue of the state of this summary judgment record to agree with some of the conclusions reached by the majority, I cannot agree that the district court judge committed error when he entered summary judgment in favor of the General Contractors Association (GCA).
 
 I.
 
 57
 The majority concedes that it could find "no evidence that the General Contractors Association participated in the hiring or firing decisions and policies of G & Q Drywall, Inc.," the plaintiffs' former employer, and that "(t)here is no basis for inferring any association activity leading to the discharge of plaintiffs." At 86. Nevertheless, the majority concludes that possible liability of GCA may not be excluded because (1) Walter Fries, the District Council's business agent who allegedly engaged in discriminatory practices with respect to the plaintiffs, served with three members of GCA on the Lehigh Valley Carpenters Joint Apprenticeship and Training Committee (JATC); and (2) GCA failed to assist G & Q supervisor Kenneth Barbarino when he sought help from the association with respect to the plaintiffs' situation.
 
 
 58
 The majority notes that its first potential ground of liability is "not fully developed in the record," id., and attempts to remedy the defects in the plaintiffs' case by relying on mere speculation. For example, the majority observes that "(w)hether (Fries) may be considered an agent for the contractors association with respect to his role in the apprenticeship committee is a matter which is not clear. If Fries were found to be an agent for JATC, then the liability of the contractors association as a joint participant in the program would be called into question." Id. at 86 (emphasis added). The majority constructs this tellingly tentative theory of liability from a single fact-that Fries was a member of the JATC in 1972. There is no sworn statement or other evidence in the record to raise a factual question as to Fries' role as an agent of the JATC when he engaged in his allegedly discriminatory practices,[1] much less any sworn statement or evidence that Fries, a union official, was an agent of GCA.
 
 
 59
 In its second speculative basis of liability, the majority builds on vague statements by Barbarino to hypothesize that GCA's failure to assist Barbarino with the plaintiffs' case raises a disputed factual question of discriminatory intent. The Barbarino testimony on which this theory is based, however, establishes no more than that Barbarino had a "feeling" that the association could not help him because of his belief that GCA was not as familiar as he was with affirmative action programs:
 
 
 60
 Q. Did you ask the Contractors Association, specifically, to do anything with respect to the carpenters?
 
 
 61
 A. Yes, I did.
 
 
 62
 Q. What, specifically?
 
 
 63
 A. I asked him-I explained to him, fully, my minority problems on the job and it seemed to me like he was in a fog concerning affirmative action. It was like he never heard those words.
 
 
 64
 Q. Are you assuming that or did he say that?
 
 
 65
 A. It seemed to me, so I would have to-
 
 
 66
 Q. I want to know, specifically, what that person said to you.
 
 
 67
 I don't want your guesses or your assumptions?
 
 
 68
 A. We spoke in generalizations and after we finished the discussion, I left with a feeling that he couldn't help me because he didn't know anything about it. I knew more than he did. So, I directed him toward my (other) laborer problems and which he took care of for me.
 
 
 69
 Q. Did you ever approach any apprenticeship committee regarding the carpenters?
 
 
 70
 A. No.
 
 
 71
 Q. Did you ever ask this person at the Contractors Association, specifically, what the mechanics were for persons to enter into an apprenticeship program?
 
 
 72
 A. No.
 
 
 73
 Excuse me, when we talked about the minorities, as individuals, we more or less just discussed it in general terms. When we finished our discussion, I had determined that he really didn't know that much about affirmative action or equal opportunity or anything involving that area.
 
 
 74
 Q. That was your assumption?
 
 
 75
 A. Yes.
 
 
 76
 App. at 708a-709a. Clearly, Barbarino's "feelings" and "assumptions" concerning GCA's ability to assist him with the plaintiffs' problems are insufficient to raise a factual issue as to discriminatory intent sufficient to withstand a summary judgment motion.
 
 
 77
 On a motion for summary judgment, every reasonable inference must be afforded the party opposing the motion, here, the plaintiffs. Sanford v. O'Neill, 616 F.2d 92, 96 (3d Cir. 1980). Even by that strict standard, there has been no showing of any disputed facts that would warrant denying GCA's motion. If such facts are to be found in the record, the plaintiffs have not revealed them, either to GCA, to the district court, or to us. That being the case, the district court, in my opinion, was clearly correct in entering summary judgment in favor of GCA.
 
 II.
 
 78
 Turning to the liability of the other defendants, I frankly must state that the record is so equivocal and confused that it defies any reasonable summary judgment analysis. Each of the parties apparently was intent on pursuing its own factual and legal course with little regard given by the plaintiffs to the defendants' assertions, and with little recognition by the defendants of, what I suspect, the plaintiffs were claiming. No affidavits appear in the record, leaving us to forage through various deposition transcripts with relatively little direction as to material testimony. Accordingly, it is well-nigh impossible for me to tell which, if any, of the many shifting assertions of the parties are disputed by their opposite numbers, let alone whether they have generated genuine disputes of material fact which would preclude the granting of summary judgment.
 
 
 79
 Under these circumstances, considering that all reasonable inferences are to be resolved in favor of the plaintiffs as the non-moving party, Sanford v. O'Neill, supra, 616 F.2d at 96, and with recognition of the fact that by denying summary judgment we are here doing no more than requiring the parties to come to grips in a plenary context with the particular facts of this controversy, I cannot reject the majority's conclusion that we should send this case back to the district court for resolution, on a full record, of the factual disputes. At the very least, perhaps some clarification could be forthcoming from which an intelligent summary judgment analysis could once again be made.
 
 
 80
 I recognize that these are frail reasons for denying summary judgment. I also recognize that in this case the plaintiffs have probably succeeded in defeating summary judgment more by reason of a poorly developed and poorly presented record than by reason of a defined, clear, and precise analysis. Nevertheless, I still cannot urge that we affirm the district court's judgment because I cannot be certain from the briefs, the record, and the oral argument that no genuine issue of material fact exists.
 
 
 81
 It does seem to me that some efforts should have been exerted by counsel to assist the district court judge and this court in distilling the record and in analyzing the issues raised by this motion. The briefs submitted to this court and the memoranda submitted on the summary judgment motion below only hint that genuine factual disputes exist, instead of clearly delineating what is and is not contested.
 
 
 82
 For example, the defendants claim that plaintiff Peterson was fired because of his tardiness and absence from work, while the plaintiffs point to testimony that although lateness was a factor in Peterson's discharge, Peterson would not have been dismissed had it not been for the racial animus shown toward him on the job site. We have not been directed to any testimony, however, directly attributing this animus to these particular defendants. Similarly, the defendants state that plaintiff Doster was laid off due to lack of work. The plaintiffs, while not contradicting the fact that there was no more work for Doster to do, respond that the only reason Doster lacked work was that no white journeymen carpenter would work with him. Again, a gap apparently exists between this latter assertion of racially motivated acts and the particular defendant responsible for them. Thus, at the most, with respect to both sides' presentations, the proofs are inconclusive on the question of whether the dismissals of Peterson and Doster can or cannot be attributed to the particular named defendants.
 
 
 83
 The parties also apparently do not meet head-on the issue of whether the defendants attempted to derail the plaintiffs' efforts to join the union and to gain admittance into the apprenticeship program. For example, the defendants claim that Fries, the District Council's business agent, told Doster that he would bring the appropriate application forms to the job site, but that Doster had been laid off before the date the forms were to be delivered. On the other hand, the plaintiffs assert in conclusory fashion and without detailing the facts, that Doster's request for the forms was "denied."
 
 
 84
 Certainly, sound summary judgment motion practice requires a great deal more than that with which we have been furnished. As a result of the state of this record, each member of this court has been required to spend far more time in trying to piece together and analyze the issues than should have been necessary. What we are left with is a confused and inconclusive record that is permeated with troubling suggestions of racial animosity toward the plaintiffs. In the presence of such ambiguity, I can do no more at this stage than to conclude that the entry of summary judgment in favor of the District Council, local union, and individual defendants (Fries, Miller, and Larsen) was inappropriate.
 
 III.
 
 85
 As I have indicated above, the summary judgment record with which we have been confronted leaves a great deal to be desired. As a result of that presentation, in my opinion, an anomalous situation has resulted. Here, largely as a consequence of less than adequate lawyering, a result has been achieved that might not otherwise have been obtained. Although the parties have invited us to choose among competing inferences that could be drawn from the depositions, in a summary judgment context, a "court is not entitled to and cannot 'sift' the facts it believes to be important from those it regards (as) insignificant." Braden v. University of Pittsburgh, 552 F.2d 948, 967 (3d Cir. 1977) (en banc) (Garth, J., concurring). Thus, I am compelled to agree with the majority that as to the Lehigh Valley District Council, Local No. 368, and the individual defendants, a further development of the facts should be had. There are enough suggestions in the record of racial discrimination, albeit only imprecisely defined and vaguely attributed to these particular defendants, to preclude summary judgment prior to a more complete development of the evidence.[2]
 
 
 86
 In concurring with the majority's conclusions as to these defendants for all of the reasons which I have stated, I nevertheless dissent from the majority's holding vacating the summary judgment entered in favor of GCA.
 
 
 
 [1]
 The court had previously granted the Contractors Association's motion to strike Peterson's & Doster's separate Title VII claims. Both plaintiffs' claims under the first, thirteenth and fourteenth amendments, counts for punitive damages under Title VII and § 301 of the Labor Management Relations Act, claims under § 1983, and Doster's claim against the union defendants under Title VII were also stricken. See Peterson v. Lehigh Valley District Council, 453 F.Supp. 735 (E.D.Pa.1978). Plaintiffs' motion for class certification was also denied. Peterson v. Lehigh Valley District Council, 83 F.R.D. 474 (E.D.Pa.1979)
 
 
 [2]
 Although the defendants assert that no applications for the program were accepted in 1972, there is no evidence whether the decision to close the program for the year was arrived at before or after the plaintiffs began to work for G & Q. The mere fact that no applications were accepted that year is not conclusive on this record, since it does not foreclose the inference that the program was closed only when plaintiffs expressed an interest in participating
 Moreover, the testimony regarding the application policy for the apprenticeship program itself is in conflict. On the one hand, Fries testified that in years when the construction industry is slow, such as 1972, no applications are accepted at all. Yet he also testified that when the program was closed, applications were taken and were kept on file until it was reopened.
 " We are not dealing here with situations where a union has affirmatively caused the employer to commit the alleged breach of contract. In cases of that sort where the union's conduct is found to be an unfair labor practice, the NLRB has found an unfair practice by the employer, too, and has held the union and the employer jointly and severally liable for any back pay found owing to the particular employee who was the subject of the joint discrimination.... Even if this approach would be appropriate for analogous § 301 and breach-of-duty suits, it is not applicable here."
 
 
 [1]
 The only evidence of Fries' role within the JATC appears in an oblique portion of his deposition:
 Q. Were there any discussions in the Lehigh Valley District Council between Committee members about promoting black membership?
 A. Well, there were discussions held when we had the Apprenticeship Committee meetings and a discussion followed as to how we could get minorities involved in this.
 Q. What did you determine?
 A. Well, really, nothing because we didn't know what to do. We were doing what we were required to do and that was to post the notices and we didn't get any response, anyway.
 Q. Who told you what you were required to do?
 A. The Pennsylvania Department of Labor and also the United States Department of Labor.
 App. at 779a-780a.
 
 
 [2]
 On this record, I am also forced to agree that the district court should not have granted summary judgment on the plaintiffs' § 301 claims