**Philip ZINMAN, Individually and on behalf of all others similarly situated**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION.**

Civ. A. No. 80–3281.

United States District Court, E.D. Pennsylvania.

June 30, 1983.

Stuart H. Savett, Kohn, Savett, Marion & Graf, Philadelphia, Pa.; for plaintiffs.

Arthur R. Littleton, Robert W. Sayre, Philadelphia, Pa., Frank L. Skillern Jr., Washington, D.C., for defendants.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### I. INTRODUCTION

Plaintiff, owner of common stock of First Pennsylvania Corporation ("First Pennsy"), the holding company of the First Pennsylvania Bank, NA ("First Pennsylvania Bank" or "Bank"), instituted this action, individually and on behalf of a putative class of shareholders of all common stock to challenge the statutory authority of the Federal Deposit Insurance Corporation ("FDIC") in imposing certain conditions to a financial assistance package offered the First Pennsylvania Bank.[1]

Plaintiff's amended complaint seeks declaratory and injunctive relief invalidating only certain terms of the assistance plan. It alleges *inter alia* that the conduct of FDIC in taking, retaining or exercising warrants is unauthorized by Section 13(c) of the Federal Deposit Insurance Act (the "Act"), 12 U.S.C. § 1823(c), and that issuance of these warrants to FDIC without pre-emptive rights to class members violates the provisions of the Act.

---

1. Plaintiff filed this action against FDIC only. On April 28, 1981, we granted FDIC's motion to join First Pennsy and the Bank under Fed.R. Civ.P. 19. Thereafter, plaintiff moved for re-consideration and First Pennsy and the Bank moved to intervene under Fed.R.Civ.P. 24. These motions as well as plaintiff's motion for class certification are now denied as moot.

Therefore, plaintiff seeks the return to First Pennsy for cancellation of 13,000,000 warrants now held by FDIC. In the alternative, plaintiff seeks to deny FDIC the right to exercise the warrants or, if FDIC were permitted to sell any of them, to compel their sale to plaintiff and other members of the class on a *pro rata* basis.

Presently before the court is FDIC's motion for summary judgment. Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Although any doubt as to the existence of genuine issues of fact must be resolved against the moving party and any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party, "summary judgment is a useful procedure when there is no dispute about the critical facts and it serves to eliminate the expense and delay of unnecessary trials." *Peterson v. Lehigh Valley District Council, United Brotherhood of Carpenters and Joiners*, 676 F.2d 81, 84 (3d Cir.1982). For the reasons set forth herein, the motion is granted.

## II. FACTS

The facts in this case are not in dispute. In the spring of 1980, First Pennsylvania Bank encountered severe liquidity problems and formally requested financial assistance from the FDIC. Following a determination that the Bank was in danger of closing by the Comptroller of the Currency, the Bank's regulatory overseer, the FDIC Board of Directors found that the continued operation of the Bank was essential to the community and agreed to render assistance under Section 13(c) of the Act.

After extensive negotiations with First Pennsy and First Pennsylvania Bank, the FDIC and a nationwide consortium of twenty-seven financial institutions offered an assistance package ("Assistance Plan" or "Plan") of $500 million in term loans: $325 million from the FDIC and $175 million from the private lending institutions. Under the credit agreement the loans had a five-year maturity. No interest was payable on the FDIC loan for the first year; for the remaining four years the interest rate was to be 125% of the average yield on the FDIC's investment portfolio.[2] In addition to the credit agreement there was a warrant agreement which required First Pennsy to issue 20 million warrants which might be exercised to acquire newly issued First Pennsy shares at $3.00 a share.[3] The warrants were granted to all the lenders according to their proportion of the total loan; the private lending institutions were to receive an aggregate of 7 million warrants and the FDIC was to receive 13 million warrants.

As a condition to receiving FDIC assistance, certain restrictions affecting the future operation of First Pennsy and the Bank were to be implemented. All directors and principal officers would serve subject to FDIC approval and the FDIC would approve their compensation. The FDIC had to approve any payment of dividends as well as any other major policy decisions of the bank.

A 28-page proxy statement setting forth a summary of the terms and conditions of the proposed Plan, including the credit and warrant agreements, was mailed to shareholders. It was accompanied by a transmittal letter of May 2, 1980 from George Butler, Chairman of First Pennsy's Board of Directors, that stated, in part:

The Board of Directors of the Corporation [First Pennsy] believes that the Plan, which is intended to assist the Bank in meeting its serious earnings and liquidity problems, is essential to the survival of the Bank as a viable institution providing

---

**2.** The interest rate on the loans from the lending institutions was to be adjusted annually in conjunction with the certificate of deposit rate for prime banks.

**3.** The exercise price of $3.00 was approximately 50% of the average daily closing price of the common stock for the thirty-day period ending April 15, 1980.

important banking services to the community. The Board of Directors of the Bank and the federal bank regulatory authorities have determined that the Bank is in danger of closing. There is a strong possibility that there would be a failure and subsequent receivership of the Bank if the Assistance Plan is not implemented because of non-approval by the stockholders. This, in turn, could result in the Corporation's bankruptcy and the loss of the stockholders' investment.

At a shareholders' meeting on May 28, 1980, the Assistance Plan was approved by 86% of those shares represented voting in favor, 4.9% voting in opposition and 9.1% not voting.[4] On May 29, 1980, 13 million of the warrants were issued to the FDIC.

## III. DISCUSSION

Defendant contends that plaintiff lacks standing to maintain this class action; this would be the case if the loss arises only indirectly from plaintiff's status as a shareholder. The contention is that this action can only be a derivative action on behalf of the corporation not an individual action on behalf of plaintiff and the class. The law on this issue has been succinctly stated: " * * * If the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action. On the other hand, if the wrong is primarily against the corporation, the redress for it must be sought by the corporation, except where a derivative action by a stockholder is allowable, and a stockholder cannot sue as an individual. The action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets." 13 W. Fletcher, Corporations § 5911 (1970). *See also* J. Moore, Federal Practice ¶ 23.1.16[1] (2d ed. 1969).

*In re Penn Central Securities Litigation,* 347 F.Supp. 1324, 1326 (E.D.Pa.1972).

■ The same allegations of fact may support either a derivative suit or a direct cause of action. *Borak v. J.I. Case,* 317 F.2d 838 (7th Cir.1963) *aff'd,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Here plaintiff's complaint has certain attributes of a derivative action. It is brought by a shareholder on behalf of a putative class of shareholders and at least one form of relief sought, cancellation of the 13 million warrants, would result in return of the warrants to the corporation rather than their distribution to the members of the class. But the characteristics of this action when viewed as a whole are those of a direct suit. Plaintiff's complaint alleges direct personal injury from the loss of control and potential dilution of share value if the warrants are exercised by the FDIC. Plaintiff does not contend that the corporation has been or will be injured. Nor does he allege that the corporate officers and directors mismanaged the business or misappropriated corporate funds. To the contrary, plaintiff concedes that the Assistance Plan was necessary to the continued financial viability of the Bank. And while these internal inconsistencies in plaintiff's case may cast doubt on its merits, this does not deny plaintiff the right to bring the action. The gravamen of Zinman's complaint alleges direct injury; plaintiff has standing to sue.

Plaintiff's primary allegation is that the FDIC lacks statutory authority to acquire securities and consequently that the warrant agreement as a term and condition of the financial assistance plan is void as to

---

4. As of May 2, 1980, plaintiff Zinman individually owned more than 180,000 shares of First Pennsy common stock. In addition, Zinman was a joint trustee for two trusts owning approximately 22,000 shares. He voted only 1,000 of his shares against the Assistance Plan and did not vote his remaining shares; however, as a fiduciary, he voted all trust shares in favor of the Plan.

the FDIC.[5] Congress created the FDIC in 1933 [6] in response to the financial chaos of the Great Depression. It was intended to "preserve solvency of insured banks and thus to keep open the channels of trade and commercial exchange." *Weir v. United States,* 92 F.2d 634, 636 (7th Cir.), *cert. denied,* 302 U.S. 761, 58 S.Ct. 368, 82 L.Ed. 590 (1937). *See also, First State Bank of Hudson County v. United States,* 599 F.2d 558 (3d Cir.1979), *cert. denied,* 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980); *Freeling v. FDIC,* 221 F.Supp. 955 (W.D. Okl.1962), *aff'd,* 326 F.2d 971 (10th Cir. 1963). Powers were conferred upon it, *inter alia,* "to make contracts," "to sue and be sued," "to act as receiver," and to exercise "all powers specifically granted by the provision of [the Act] and such incidental powers as shall be necessary to carry out the powers so granted;" 12 U.S.C. § 1819. Included among these powers was the authority to extend loans as provided by Section 13(c) of the Act, 12 U.S.C. § 1823(c).[7] That section states:

> In order to reopen a closed insured bank or, when the Corporation has determined that an insured bank is in danger of closing, in order to prevent such closing, the Corporation, in the discretion of its Board of Directors, is authorized to make loans to, or purchase the assets of, or make deposits in, such insured bank, upon such terms and conditions as the Board of Directors may prescribe, when in the opinion of the Board of Directors the continued operation of such bank is essential to provide adequate banking service in the community. Such loans and deposits may be in subordination to the rights of depositors and other creditors.[8]

Plaintiff claims that the absence of express language granting the FDIC the power to acquire securities is dispositive of its lack of authority to do so. But assistance must be tailored to the unique circumstances of the endangered bank. To avoid bank failure and the resulting disruption to the financial community, FDIC actions must be prompt. The expansive regulatory purposes of the Federal Deposit Insurance Act, the broad language of § 1823(c) allowing loans to be made "upon such terms and conditions as the Board of Directors prescribes" and the stated intent of Congress that the FDIC exercise "such incidental powers as are necessary," 12 U.S.C. § 1819, lead us to conclude that Congress intended 12 U.S.C. § 1823(c) to be construed liberally to effectuate the purposes of the Act and achieve stability in the banking community for sake of the nation's economy. The exercise of authority by the FDIC here was

---

5. By bringing this action against the FDIC only, plaintiff seeks to avoid whether the issuance of warrants to the private lending institutions was valid. Plaintiff's approach emphasizes the procedural problems posed by the requested relief that "this court issue a permanent injunction requiring the FDIC to return to First Pa. all of the 13,000,000 warrants for cancellation." Plaintiff did not adequately address the court's concern that if deemed invalid, the warrant provision may not be severable as to the FDIC only and may not be severable from the other provisions of the Financial Assistance Plan. Moreover, if the warrants were invalidly obtained, the loan might be subject to rescission in whole or in part.

6. The FDIC was originally created by Act of June 16, 1933, c. 89, § 8, 48 Stat. 168 which added Section 12B to the Federal Reserve Act, Act Dec. 23, 1913, c. 6, 38 Stat. 648. Section 12B was withdrawn from the Federal Reserve Act and made a separate Act, the Federal Deposit Insurance Act on September 21, 1950, c. 967 § 2[9], 64 Stat. 881.

7. Title 12 U.S.C. § 1823(c) was amended by Congress on October 15, 1982, Pub.L. 97–320, 96 Stat. 1469. While we apply the law applicable at the time the controversy arose, the amendments as they pertain to plaintiff's allegations are discussed at 12–14, *infra.*

8. FDIC assistance under § 1823(c) had been rendered on only four occasions prior to the First Pennsy Assistance Plan. The FDIC had authorized direct financial assistance under Section 13(c) on the following occasions: (1) in 1971 to Unity Bank and Trust, Boston, Massachusetts; (2) in 1972 to Bank of the Commonwealth, Detroit, Michigan; (3) in 1974 to American Bank and Trust Company, Orangeburg, South Carolina; and (4) in 1976 to Farmers Bank of the State of Delaware, Wilmington, Delaware. None appear to have been the subject of judicial consideration; the matter before us is one of first impression.

consistent with the flexibility authorized by Congress.

Plaintiff's challenge to the FDIC's authority is not unlike challenges brought by shareholders contesting the power of Reconstruction Finance Corporation to condition grants of emergency financial assistance where the conditions allegedly were adverse to shareholders. The relevant provision of the Reconstruction Finance Corporation Act under review in those cases was much like Section 13(c) of the Act; it stated that "[t]o aid in financing agriculture, commerce and industry ... the Corporation is authorized and empowered to make loans, upon such terms and conditions not inconsistent with this chapter, as it may determine to any bank." Former 15 U.S.C. § 605.[9] The courts in this context took a broad view of the "terms and conditions" which the Reconstruction Finance Corporation might impose in extending a loan. *RFC v. Central Republic Trust Co.,* 11 F.Supp. 976 (N.D.Ill.1935); *RFC v. Central Republic Trust Co.,* 17 F.Supp. 263 (N.D.Ill. 1936), *aff'd sub nom, RFC v. McCormick,* 102 F.2d 305 (7 Cir.1939) (RFC's right to enforce condition requiring loan recipient's shareholders to pay past due RFC assistance loan upheld); *Todd v. Maryland Casualty Company,* 155 F.2d 29 (7th Cir.1946) (RFC's right to hold common stock as security for its loan to an insurance company upheld).

The basis for broad construction of the Reconstruction Finance Corporation Act was that the loans extended by the RFC were used for rehabilitation and strengthening not only of the recipient's financial structure but the nation's as well:

It also should not be overlooked that RFC was a corporation not engaged in business for profit with the attendant motive oftentimes found to take advantage of those with whom it deals. On the other hand, it was an agency created by the government for the sole purpose, as far as we are aware, of rendering assistance by the use of government funds to those in financial need, not only for their benefit and protection but for the welfare of the country as a whole.

*Id.* at 38.

In *RFC v. Central Republic Trust, supra,* where the loan under consideration was to a bank, the court recognized that the stability of the economy resulted from the protection of depositors as opposed to shareholders:

We must not lose sight of the fact that the primary purpose of the banking laws, as well as the Reconstruction Finance Corporation Act, so far as it concerns banks, is the protection of depositors and not shareholders.

17 F.Supp. at 295.

This policy consideration in favor of a broad reading of the "terms and conditions" phrase in the Reconstruction Finance Corporation enabling legislation is equally applicable to Section 13(c) of the Federal Deposit Insurance Act. The FDIC was also granted flexibility in imposing conditions to an assistance package, although the specific "terms and conditions" to a loan may not be inconsistent with the ultimate purpose of the Act.

Here the acquisition of warrants by the FDIC served a number of purposes. It is uncontested that the FDIC and the consortium of banks extended a loan of $500 million to First Pennsy at a subsidized rate. The warrants provided a means for the lenders to increase their yield on the loan[10]

---

**9.** This section has since been repealed and the Reconstruction Finance Corporation abolished.

**10.** The concern of the FDIC to preserve its financial resources is an incidental but necessary regulatory function. The Senate Report accompanying the 1982 amendments to the Act emphasizes this point:

During the period January 1, 1981 through July 30, 1982, 26 commercial banks and 9 mutual savings banks were closed by the FDIC because of financial difficulties. Although only 4 of these necessitated direct payment of insured deposits by the FDIC, the total cost of FDIC assistance in these 35 instances has been $1.7 billion. If 1981 losses for savings banks continue, by the end of 1983, 16 savings banks (with $21 billion in assets) will have negative net worth, and 42 savings banks (with $34 billion in assets) will have net worth between 0 and 3 percent. While the FDIC fund exceeds $13 billion in

and for additional capital infusion through the year 1987 [11] if deemed necessary by the lenders. However, as defendant FDIC concedes, an important reason for the issuance of warrants was to ensure that by this dilution the shareholders of First Pennsy would not simply receive a windfall from the financial assistance package which might encourage other banks to engage in speculative practices. It also permitted transfer of management control to a third party if later deemed necessary to save the bank and protect the loan. Plaintiff contends that the FDIC acted as "prosecutor, judge and jury to assess fault and mete out punishment" and that punishment was not an authorized function of the FDIC. This argument is premised on an assumption of entitlement to assistance. But the FDIC has no obligation to "bail out" a bank to protect its shareholders.

The concerns to be balanced in structuring a Section 13(c) assistance plan were explained by Irving Sprague, then Chairman of the FDIC, in a statement to the House Subcommittee on Commerce, Consumer and Monetary Affairs on July 16, 1981:

> Structuring of a 13(c) assistance transaction requires careful balancing. Sufficient assistance must be provided, yet care must be exercised to assure that shareholders and management do not unduly benefit. Our purpose is to protect depositors and assure the maintenance of adequate banking services in the community. The stockholders and management are expected to bear the consequences of the bank's financial difficulties. As was the case with First Pennsylvania, severe restrictions are placed on management and on the rights of shareholders as a part of any 13(c) transaction until such time as the FDIC's financial commitment

has been repaid and the bank's viability restored. While these restrictions are not punitive in nature, they usually are onerous. Because of the Corporation's limited use of its 13(c) powers as well as the strict limitations placed on management and ownership in connection with its use, the industry does not regard 13(c) assistance as a "bail-out" which would justify the assumption of excessive risk in other institutions. We have been very selective and careful in our use of this power in order that such a perception would not arise.

Statement on FDIC Procedures in Handling Failed or Failing Banks, Exhibit 23 to Sprague deposition; Exhibit 17 to Skillern deposition. Therefore, the intent of Section 13(c) is no different from that of the Act itself: to promote the soundness of the nation's banking system, *not* to create any duty on the part of the FDIC to protect management, *cf., First State Bank of Hudson v. U.S., supra;* or the investment of shareholders. *FDIC v. Citizens State Bank,* 130 F.2d 102, 104 n. 6 (8th Cir.1942). The acquisition of warrants represents a legitimate regulatory effort by the FDIC to minimize a windfall gain to shareholders from government assistance.

In addition, the shareholders' investments could have been at greater risk in the alternative forms of FDIC assistance authorized under the Act. For example, the FDIC generally assists failed or failing banks by a purchase and assumption transaction under Section 13(e), 18 U.S.C. § 1823(e) (Statement on FDIC Procedures, *supra;* Isaac deposition at 26). The bank, if not already closed, is allowed to fail and then placed in receivership. In liquidation, the assets and liabilities of the bank are transferred to another institution, usually with FDIC assistance. *Id.* The FDIC is reimbursed for

---

assets and its annual income is approximately $2 billion, the importance of preserving the fund's resources is obvious from the significant cost of assistance already committed to distressed institutions.
S.Rep. No. 536 (accompanying S.2879), 97th Cong. (1982), U.S.Code Cong. & Admin.News 1982, p. 3054, 3057.

11. The warrants may be exercised for seven years (until May 28, 1987) while the loan is to be repaid within five years (until May 28, 1983). Whether the warrants may extend beyond 1985 if the loan is then repaid in full need not now be resolved.

funds expended in the transaction and the balance is applied to subordinated noteholders. *Id.* If anything remains after payment to the subordinated noteholder, the shareholders are paid. In most instances, little, if anything, is left for the shareholders. (Isaac deposition at 26).

Plaintiff maintained at the time the motions were briefed that the then proposed and now enacted statutory amendments to Section 13(c), establish that prior to their enactment the FDIC lacked the authority to acquire securities.

Section 23(c), as presently amended states in pertinent part:

(c)(1) The Corporation is authorized, in its sole discretion and upon such terms and conditions as the Board of Directors may prescribe, to make loans to, to make deposits in, to purchase the assets *or securities of,* to assume the liabilities of, or to make contributions to, any insured bank

(A) If such action is taken to prevent the closing of such insured bank;

(B) If, with respect to a closed insured bank, such action is taken to restore such closed insured bank to normal operation; or

(C) If, when severe financial conditions exist which threaten the stability of a significant number of insured banks or of insured banks possessing significant financial resources, such action is taken in order to lessen the risk to the Corporation posed by such insured bank under such threat of instability. . . .

18 U.S.C. § 1823(c), Pub.L. No. 97–320, 96 Stat. 1469 (1982) (emphasis added). Plaintiff asserts the recent addition to allow the FDIC "to purchase the . . . securities of . . . any insured bank" demonstrates that the FDIC was not authorized by Congress

to hold securities of an insured bank prior thereto.

The legislative history to the 1982 amendments establishes that these modifications were enacted to "update statutes to accommodate the changes [12] which have already occurred in the financial marketplace." S.Rep. No. 536 (accompanying S.2879) 97th Cong. (1982) at 2, U.S.Code Cong. & Admin. News 1982, p. 3055. We are mindful that the Senate Report also states:

. . . with respect to direct assistance, present law permits the FDIC to assist by making loans to, or purchasing assets of, or making deposits in the insured bank. This section expands FDIC's power by authorizing FDIC also to purchase the securities of, to assume the liabilities of, and to make contributions to, any insured bank.

*Id.* at 45, U.S.Code Cong. & Admin.News 1982, p. 3099. The FDIC's requiring warrants as a condition to the extension of a substantial loan in its capacity as creditor was not the "purchase of securities" permitted for the first time by the 1982 amendments. But even if it were, we would be guided by the Supreme Court's repeated observation that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Andrus v. Shell Oil Co.,* 446 U.S. 657, 665 n. 8, 100 S.Ct. 1932, 1938 n. 8, 64 L.Ed.2d 593 (1980) *quoting from United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960). The recent amendments form no basis for invalidating the warrant provision of the Financial Assistance Plan extended as a loan pursuant to the FDIC's powers under Section 13(c).

■ Plaintiff argues, in the alternative, that regardless of the FDIC's authority to acquire warrants, the shareholders of First Pennsy must be accorded pre-emptive

**12.** The House Report accompanying the proposed amendments sets forth a description of the depressed conditions of depository institutions:

Deregulation, technological change, and severe dislocation in the economy created an environment which threatened the stability of our financial service delivery system. Par-

ticularly telling was the rapid rise and subsequent volatility of interest rates. Those depository institutions that have traditionally borrowed money with short maturities and lent those funds with long maturities are the ones hit hardest by these changes.

H.R. No. 550 (accompanying H.6267), 97th Cong. (1982) at 9.

rights upon their exercise. The express language of the Warrant Agreement denies such rights. It states:

> *Reservation. of Shares.* The Company will at all times have authorized, and reserve and keep available, free from pre-emptive rights, for the purpose of enabling it to satisfy any obligation to issue Shares upon exercise of Warrants, the full number of Shares deliverable upon the exercise of all outstanding Warrants
> . . . .

Exhibit F at 5. Plaintiff fails to allege that First Pennsylvania's Articles of Incorporation provide such rights and Pennsylvania law, 15 P.S. § 1611 A, does not impose pre-emptive rights.

Plaintiff contends, however, that Section 11(k) of the Act, 18 U.S.C. § 1821(k), demonstrates a Congressional intent to provide pre-emptive rights to shareholders when new shares are issued pursuant to Section 13(c) assistance. Section 11(k) states, in pertinent part:

> Whenever in the judgment of the Board of Directors it is desirable to do so, the Corporation shall cause capital stock of the new bank to be offered for sale on such terms and conditions as the Board of Directors shall deem advisable in an amount sufficient, in the opinion of the Board of Directors, to make possible the conduct of the business of the new bank on a sound basis . . ., for the organization of a national bank in the place where such new bank is located. The stockholders of the closed insured bank shall be given the first opportunity to purchase any shares of common stock so offered.

Section 11(k) is part of a broader statutory scheme, 12 U.S.C. § 1821(h)–(*l*), setting forth the procedure to be followed if the FDIC forms a Deposit Insurance National Bank ("DINB"), that is, a new bank organized subsequent to liquidation of an insured bank. The formation of a DINB is addressed in Section 11(h):

> As soon as possible after the closing of an insured bank, the Corporation, if it finds that it is advisable and in the interest of the depositors of the closed bank or the public, shall organize a new national bank to assume the insured deposits of such closed bank and otherwise to perform temporarily the functions hereinafter provided for. The new bank shall have its place of business in the same community as the closed bank.

If a new DINB offers shares of stock, it does so to raise capital; it is reasonable and equitable that the former bank shareholders, having suffered the consequences of liquidation, be offered first right to purchase any shares of stock offered.

But the FDIC and a consortium of banking institutions extended a substantial loan to First Pennsy to *prevent* liquidation, receivership and creation of a new bank. As major creditors they acquired warrants to increase their yield and to ensure control could be transferred if necessary to achieve stabilization during the years covered by the warrants. *See, Todd, supra* at 37 (analogizing right of federal regulatory agency to secure a loan by acquiring stock in the recipient corporation to that of a private creditor). First Pennsy shareholders having been spared a liquidation and having derived substantial benefit from this extraordinary loan cannot take advantage of the equitable principles underlying Section 11(k). The rights of shareholders under a DINB are not transferrable to a situation where Section 13(c) assistance is requested and accepted.

Plaintiff also contends that acquisition of warrants by the FDIC places the agency in an untenable conflict of interest position because its status as a potential investor is by necessity at odds with its role as a federal regulator. Defendant FDIC argues that its acquisition of warrants does not confer upon it shareholders' rights, including the right to vote, or a controlling interest in the bank. However, for this motion we accept plaintiff's contention that the interrelationship of the terms of the Assistance Plan together with the FDIC's right to acquire perhaps as much as 45% of the outstanding shares of First Pennsy stock (depending upon whether or not the lending banks choose to execute their warrants), would

place the FDIC in a position of potential control.[13]

Supervisory responsibility for a nationally chartered bank which is a member of the Federal Reserve System rests with the Office of the Comptroller of the Currency. *Cooper v. O'Connor,* 99 F.2d 135 (D.C.Cir. 1938), *cert. denied,* 305 U.S. 642, 59 S.Ct. 146, 83 L.Ed. 414 (1938), *reh'g denied,* 305 U.S. 673, 59 S.Ct. 241, 83 L.Ed. 436 *reh'g denied,* 307 U.S. 651, 59 S.Ct. 1035, 83 L.Ed. 1530 (1939). While virtually all commercial banks in the United States have FDIC insurance, the FDIC exercises supervisory jurisdiction at the federal level over those insured banks which are state chartered and not members of the Federal Reserve System. 12 U.S.C. § 1813(q)(3). Since First Pennsy is a nationally chartered bank and a member of the Federal Reserve System, the Comptroller of the Currency acts as its federal regulator.

■ Plaintiff argues that the conflict exists nonetheless because the Comptroller of the Currency is one of three members of the FDIC. 12 U.S.C. § 1812. But mere presence of the Comptroller of the Currency on the Board of Directors of the FDIC does not constitute an invalid conflict of interest per se. *See, Landy v. FDIC,* 486 F.2d 139 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). In the absence of a specific allegation of wrongdoing or bad faith supervision of the Bank, we find no substance to plaintiff's contention.

■ Plaintiff's complaint alleges the FDIC's acquisition of warrants violated the Change in Bank Control Act of 1978, Section 7(j) of the Federal Deposit Insurance Act, 12 U.S.C. § 1817(j) ("Bank Control Act") and as a result of this violation the provision for warrants was void. This argument also lacks merit.

The Bank Control Act states, in pertinent part:

No person, acting directly or indirectly or through or in concert with one or more other persons, shall acquire control of any insured bank through a purchase, assignment, transfer, pledge or other disposition of voting stock of such insured bank unless the appropriate Federal banking agency has been given sixty days' prior written notice of such proposed acquisition and within that time period the agency has not issued a notice disapproving the proposed acquisition or extending for up to another thirty days the period during which such a disapproval may issue.

The Federal Reserve Board is the federal banking agency responsible for changes in control of bank holding companies. 12 U.S.C. § 1817(j)(1). In response to a request for an opinion by the FDIC's General Counsel, the Legal Division of the Federal Reserve Board issued an opinion on May 20, 1980 finding that the FDIC's assistance to First Pennsylvania Bank did not violate the Bank Control Act:

. . . the Change in Bank Control Act and the Board's regulation are not applicable to the acquisition of warrants that give the holder thereof the right to purchase voting shares of a bank or bank holding company. The Change in Bank Control Act is directed to the acquisition of control, through dispositions of voting stock, of an insured bank or a bank holding company. In the situation that you present, the FDIC, as well as the lending institutions, would not be acquiring voting stock of First Pennsylvania Corporation but only the right to purchase voting stock under the terms described in the warrants. We do not regard the obtain-

---

**13.** While we accept for purposes of plaintiff's argument that the warrants conferred potential control upon the FDIC, we note plaintiff's deposition testimony that control existed by virtue of other conditions to the Assistance Plan, *see,* Facts, *supra* at 4, rather than by the acquisition or exercising of the warrants.

They didn't need it [the warrants] for control, because the agreement as it is spelled

out was more complete control than any shareholder would have both as to the corporation and the bank.

Zinman Deposition at 16. Plaintiff does not contest the FDIC's authority to condition the Plan upon other indicia of control such as the right to prohibit dividends, exercise veto power over directors and certain officers and disapprove major policy decisions.

ing of a right to purchase voting stock in the future as being the acquisition of voting stock and, therefore, the Change in Bank Control Act would not apply. Of course, the provisions of the Change of Control Act and the Board's regulation may apply to the exercise of the warrants in the future, depending on the amount of voting stock that may be acquired.

The construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. *E.I. duPont de Nemours & Co. v. Collins,* 432 U.S. 46, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1977); *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). For purposes of assessing control, the distinction between holding warrants which confer no voting power and exercising the warrants to purchase voting shares, is a logical one. It is also consistent with the statutory definition that "control" pertaining to stock ownership means "to vote 25 per centum or more of any class of *voting* securities of an insured bank." 12 U.S.C. § 1817(j)(8)(B) (emphasis added). Without having exercised a minimum number of warrants the FDIC would not fall within the purview of the statute. As long as the Federal Reserve Board applies this standard on a uniform basis, and plaintiff makes no allegation that it does not, we see "no compelling indication" that the agency opinion is wrong.[14]

Finally, plaintiff maintains the Plan is unconscionable because depositors whose deposits are in excess of the $100,000 maximum insured amount do not share in the loss and the Plan was consummated without due process of law. But the FDIC was created to insure deposits, 12 U.S.C. § 1811, not the value of shares. Here the Assistance Plan has succeeded in preventing liquidation of the shares. We know of no authority, and plaintiff cites none, that mandates or even allows the FDIC to control or adversely effect deposits in excess of the insured amount when a bank has not failed. Neither is there a doctrine requiring a government agency which agrees to grant emergency assistance to provide a hearing to the requesting recipient. That assistance has so far saved an endangered bank; no property has been "taken;" the court is at a loss to understand the allegation of denial of any process due to the plaintiff or of any class he might represent.

First Pennsy and the Bank applied to the FDIC for governmental assistance when the Bank was on the brink of a financial crisis. In a matter of weeks the agency formed a consortium of public and private resources offering a $500 million loan to prevent the Bank from failing. The shareholders, including plaintiff in his capacity as a trustee, overwhelmingly approved the terms of the Plan. Now plaintiff seeks to rescind the one condition he deems unfavorable. What plaintiff contends is an unfavorable condition may not be severed from the other aspects of the Assistance Plan.[15] The exercise of authority by the FDIC in conditioning the financial assistance plan upon the issuance of First Pennsy warrants was not inconsistent with the powers granted the agency under the Act or otherwise

**14.** The FDIC argues plaintiff lacks a private right of action to enforce the Bank Control Act under the factors set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). However, as we read plaintiff's complaint, he does not seek enforcement of the Bank Control Act but rather cancellation of the warrants provision of the Financial Assistance Plan.

Nonetheless, even if defendants willfuly violated the Bank Control Act, an express remedy under the statute provides that the violator "shall forfeit and pay a civil penalty of not more than $10,000 per day for each day during which such violation continues." 12 U.S.C. § 1817(j)(15). When legislation expressly provides a particular remedy, courts should not expand the coverage of the statute to subsume other remedies. *National Railroad Passenger Corp. v. Passengers Association,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974). It therefore does not necessarily follow that violation of the statute would result in cancellation of the transfer of stock.

**15.** At plaintiff's deposition, he was asked: "But you did not object to the $325 million [FDIC's portion of the loan] that came that way, did you?" In response plaintiff stated, "Why would I object, it was part of the help." Zinman deposition at 27.

invalid. The FDIC's motion for summary judgment will be granted. An appropriate Order follows.